Larry J. FERRIOLA

v.

GULF OIL CORPORATION.

Civ. A. No. 80–201.

United States District Court,
E. D. Pennsylvania.

Aug. 13, 1980.

E. Harris Baum, Norman Zarwin, Philadelphia, Pa., for plaintiff.

---

Peter McGonigle, Philadelphia, Pa., for defendant.

## SUR PLEADINGS AND PROOF

LUONGO, District Judge.

Plaintiff is a franchisee of Gulf Oil Corporation who has operated a Gulf gasoline and service station in Northeast Philadelphia since 1971. His most recent lease with Gulf expired in August, 1979, after which the parties were unable to agree to terms for renewal. Gulf then gave notice of its intent to terminate the lease, leading Ferriola to file this action under the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2801 *et seq.* (Pub.L. 95–297, Title I, § 101, June 19, 1978), alleging that Gulf failed to provide proper notice, and was deliberately proposing commercially unreasonable terms in order to drive Ferriola out of business.

A hearing on Ferriola's request for a preliminary injunction was held on February 1, 1980. The parties negotiated an agreement permitting Ferriola to remain in the property until his request for a preliminary injunction could be consolidated with a trial on the merits under Rule 65(a)(2), F.R. Civ.P. Trial on the merits commenced on April 25, 1980, and ended on April 28. Thereafter, the parties submitted requests for findings of fact and conclusions of law, together with briefs on the legal issues. On pleadings and proof, I make the following

### I. FINDINGS OF FACT

1. Plaintiff Larry J. Ferriola is an individual operating a Gulf Service Station at 9999 Bustleton Avenue at Red Lion Road, Philadelphia.

2. Defendant Gulf Oil Corporation is a Pennsylvania corporation engaged in the refining, distribution, and marketing of petroleum products.

3. Ferriola has operated his station since 1971 under leases and related franchise agreements with Gulf.

4. Gulf leases the ground on which Ferriola's station is located from Posel Enterprises. Gulf erected the service station on one portion of the ground, and sublet the remainder for use as a miniature golf course.

5. The most recent lease between the parties was for a one-year term from August 6, 1977, to August 5, 1978. This lease was renewed for an additional one-year period expiring August 5, 1979.

6. Prior to the expiration of the lease, Gulf failed to negotiate a renewal due to personnel changes in Gulf's district management.

7. In a letter dated August 31, 1979, Gulf extended Ferriola's lease to October 5, 1979, in order to give the parties time to negotiate a renewal.

8. Ferriola's rent under the lease expiring on August 5, 1979, was $500 per month.

9. On September 4, 1979, Gulf proposed to Ferriola a new three-year lease, effective August 6, at the following rents:

| | |
|---|---|
| First year | $1,060 per month |
| Second year | 1,500 per month |
| Third year | 1,800 per month |

Ferriola rejected this proposal.

10. On October 15, 1979, Gulf proposed a new lease with a rental of $860 per month for the first year. Ferriola rejected this offer and countered with a proposal of $600 per month. Ferriola's counter-proposal was rejected by Gulf.

11. In a letter dated October 18, 1979, Gulf gave Ferriola notice that it did not intend to renew its franchise agreement with Ferriola, and that the effective date of termination would be January 16, 1980. This notice was sent in accordance with the PMPA, 15 U.S.C. § 2804(a), which requires that notice of an intent not to renew a franchise agreement must be given not less than ninety days prior to the date on which the non-renewal is to take effect.

12. In further negotiations on January 4, 1980, Gulf proposed the following terms for a renewed lease:

| | |
|---|---|
| First year | $ 860 per month |
| Second year | 1,250 per month |
| Third year | 1,600 per month |

Ferriola rejected this proposal.

13. On that same day, Gulf made a final offer of a renewed lease at the following rents:

| | |
|---|---|
| First year | $ 710 per month |
| Second year | 1,155 per month |
| Third year | 1,600 per month |

Gulf also offered an alternative proposal of a one-year lease at $810 per month. Ferriola rejected both proposals.

14. As of the date of trial the parties had reached no agreement on the terms of a new lease.

15. Prior to the negotiations with Ferriola, Donald A. Young, Gulf's Retail Marketer in whose territory Ferriola's station was located, recommended to his superiors at Gulf that Ferriola be offered a three-year lease at the following rentals:

| | |
|---|---|
| First year | $ 650 |
| Second year | 800 |
| Third year | 950 |

This recommendation was not accepted by marketing officials at Gulf, and the proposal was never made to Ferriola.

16. Gulf determined the rent increases for Ferriola's station on the basis of its newly-adopted Service Station Rental Policy. The Policy requires an evaluation of two factors in establishing rents: (a) the occupancy costs applicable to the particular station (all Gulf's expenses, including ground rent, taxes, maintenance, depreciation); and (b) the appraised fair market value of the station.

17. In Ferriola's case, since Gulf did not own the station, the fair market value of the property was not considered.

18. The occupancy costs which Gulf attributed to Ferriola's station, and which formed the basis for the rental which it proposed, are as follows:

| | | |
|---|---|---|
| 1978 | $18,676 | (actual) |
| 1979 | 19,384 | " |
| 1980 | 20,180 | (projected) |
| 1981 | 20,296 | " |
| 1982 | 21,180 | " |

19. The rent Gulf received from Ferriola was not sufficient to meet its occupancy costs, with the result that Gulf absorbed costs from Ferriola's station. The rental absorption figures are as follows:

| | | |
|---|---|---|
| 1978 | $13,176 | (actual) |
| 1979 | 13,384 | " |
| 1980 | 11,660 | (projected) |
| 1981 | 7,066 | " |
| 1982 | 1,980 | " |

20. In order to reduce its absorption of costs, Gulf obtained an additional tenant, Rollins Sign Co., to occupy a portion of the ground not used by Ferriola. The decrease in projected absorption of costs in 1981 and 1982 was attributed to expected income from the Rollins lease.

21. At least ten other Gulf dealers were offered leases which reflected a percentage increase in rent comparable to the percentage increase in the lease offered to Ferriola. At least fifteen other Gulf dealers were offered leases which called for higher rents than those in the lease offered to Ferriola, notwithstanding that their stations had lower occupancy costs than Ferriola's station.

22. Gulf offered to sell to Ferriola its interest in the lease with Posel and the improvements Gulf has erected on the site, but Ferriola concluded that he could not afford to buy them.

23. The amount of gasoline which Ferriola is supplied by Gulf each month is determined by Department of Energy allocation guidelines.

24. Recent changes in Department of Energy price guidelines have on two occasions allowed Ferriola to increase his markup on the gasoline which he sells.

25. Ferriola also derives income from repair work which he performs at the station and the sale of auto parts.

26. Ferriola's annual volume of 200,000 gallons is relatively low compared to that of other dealers. The majority of Ferriola's business consists of repair and inspection work.

27. Both Ferriola and Gulf receive income from the sale of Gulf tires, batteries, and car accessories at Ferriola's station.

28. In 1975, Gulf contracted with Fasgo, Inc., a high volume "gas and go" service station located nine-tenths of a mile from

Ferriola's station, to supply gasoline which Fasgo would sell under the Gulf logo. Gulf supplied this gasoline to Fasgo at a tank-wagon price substantially below that at which it sold to Ferriola.

29. Ferriola's gas sales before and after Fasgo began to sell Gulf are as follows (stated in gallons):

| 1970 | 168,091 | |
| 1971 | 174,041 | |
| 1972 | 161,997 | |
| 1973 | 291,450 | |
| 1974 | 615,354 | |
| 1975 | 423,692 | (Fasgo commences operation) |
| 1976 | 204,449 | |
| 1977 | 151,757 | |
| 1978 | 204,682 | |
| 1979 | 202,604 | |

The increase in Ferriola's volume during 1974 and 1975 was the result of increased allocations due to the 1974 gasoline crisis. Taking fluctuations due to the 1974 shortage into account, Ferriola's volume after Fasgo began operation does not differ significantly from his volume before Fasgo began operation.

## II. DISCUSSION

### A. *Notice of Termination*

■ Section 2804 of the PMPA provides that notification of an intent not to renew a franchise must be given to the franchisee "not less than ninety days prior to the date on which such termination or nonrenewal takes effect." Ferriola contends that § 2804 required Gulf to give him notice of intent not to renew his franchise ninety days before the expiration of his existing lease with Gulf, and that Gulf therefore violated the PMPA in that it did not give notice or even begin negotiations for renewal until after the lease expired. *Blankenship v. Atlantic Richfield Company*, 478 F.Supp. 1016 (D.Or.1979).

I do not accept Ferriola's construction of § 2804. On its face, the provision does not require that notice of termination be given ninety days before whatever termination date is specified in the lease. It only requires that notice be given ninety days before the date on which the termination is to take effect. Here, although Gulf did not give notice ninety days before the lease expiration date, it did not attempt to terminate the franchise on the date when the lease expired. Rather, it extended the term of the lease for 3 months to give the parties time to negotiate. When negotiations failed, on October 18, 1979, it gave Ferriola notice that his franchise would expire on January 16, 1980. Accordingly, Gulf complied with the literal requirement of § 2804 —that no termination shall be effective unless notice is given ninety days prior to the date when termination is to occur. *Accord, Kesselman v. Gulf Oil Corp.*, 479 F.Supp. 800 (E.D.Pa.1979), *aff'd* 624 F.2d 1090 (3d Cir. 1980).[1]

If I were to adopt Ferriola's construction, that notice must be given ninety days before the termination date specified in the lease, the franchisor would be placed in a position of giving notice of intent to terminate at the same time it was negotiating terms for a renewal of the franchise agreement, to protect itself in the event that negotiations failed. Not only would this impede negotiations, since the franchisee would then be negotiating "under the gun," it would expose the franchisor to charges that it was not negotiating in good faith since it had already given notice of termination. Clearly a more reasonable construction is that if negotiations fail, the franchisee must be given at least ninety days notice in order to make whatever arrangements are necessary to cease doing business as a franchisee, regardless of when the agreement expired.

■ Ferriola further contends that Gulf violated the Gasoline, Petroleum Products and Motor Vehicles Accessories Act, 73 Pa. Stat.Ann. § 202–4(4) (1979), which prohibits

---

1. Gulf contends that the Court of Appeals for the Third Circuit has adopted this interpretation of the notice requirements in § 2804 by its summary affirmance in *Kesselman*. I do not accept this contention, inasmuch as the Court merely refused to reverse Judge Broderick's denial of a preliminary injunction, and it is unclear what issues were reached by the Court.

a franchisor from requiring a franchisee to accept a lease for a term of less than one year. Even if I assume that the Pennsylvania statute is not pre-empted by the PMPA, Gulf has not violated it here. Gulf did not offer Ferriola a lease of less than one year. It temporarily extended his existing lease, but this was for the purpose of allowing the parties time to reach a final agreement on a three-year lease. I construe the Pennsylvania statute as prohibiting a franchisor from offering, for instance, a series of 3-month leases, and I do not accept that it prohibits temporary extensions during renewal negotiations.

### B. Grounds for Nonrenewal

Section 2802(b)(3) of the PMPA provides:

For purposes of this subsection, the following are grounds for nonrenewal of a franchise relationship:

(A) The failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if—

(i) such changes or additions are the result of determinations made by the franchisor in good faith and in the normal course of business; and

(ii) such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of preventing the renewal of the franchise relationship.

Ferriola contends that Gulf intentionally offered a lease at rents which Gulf knew he could not afford, for the purpose of driving him out of business at his location, and that its renewal offer was therefore not made in good faith.

Certain aspects of the evidence lend support to Ferriola's position: Gulf proposed an extraordinarily large increase in Ferriola's rent; the rental increases initially proposed in-house by Ferriola's marketing representative were much lower than the first offer made to Ferriola; Gulf officials were unhappy with Ferriola as a dealer; and there was an unusual delay in making any renewal proposal to Ferriola until a new rental policy could be formulated. Notwithstanding the evidence favorable to

Ferriola, however, I cannot conclude that Gulf terminated the franchise relationship in bad faith.

The evidence established that Gulf did negotiate Ferriola's lease in accordance with its new policy of considering the occupancy costs of a station in determining rent. Although the policy was newly adopted at the time Ferriola's lease was being negotiated, there is no evidence that it was a sham policy designed to eliminate dealers with whom Gulf was displeased or that it was selectively applied.

Ferriola contends that Gulf's rental policy is itself commercially unreasonable, in that it only takes into account what the station costs Gulf, without considering Gulf's profit on gasoline, and tires, batteries, and accessories sold at the station. Certainly it is true that Gulf reaps a profit on the Gulf products sold at its dealerships. Similarly, it is true that even if Gulf makes only a small profit on the retailing of its refined products, retail sale is simply the last step in a vertically integrated system in which Gulf receives a return on its investment at every step—refining, transport, distributing, and the like. Be that as it may, I cannot say that in enacting the PMPA Congress intended these factors to be considered in every franchise renewal. Nor can I conclude that Congress intended the courts to become involved in evaluating the particular business judgments and policies of oil companies so long as there is some reasonable basis for them, and they are applied in the normal course of business and in good faith. *Accord, Pearman v. Texaco,* 480 F.Supp. 767 (W.D.Mo.1979). On this record, there is no credible evidence that Gulf's policy is patently unreasonable, or designed to drive dealers out of business.

Having concluded that the rental policy itself is not invalid, I am satisfied by a preponderance of the evidence that Gulf applied the policy to Ferriola in good faith and in the normal course of its business. The occupancy costs for Ferriola's station were sufficiently high, and Ferriola's rent sufficiently low, that Gulf was required to absorb a substantial portion of the costs

each year. It was permissible for Gulf to attempt to stop cost absorption by seeking a higher rent. Furthermore, Gulf did not treat Ferriola differently than it did other dealers whose rents were also tied to their occupancy costs. Others suffered high increases, and Ferriola's proposed increase was not as high as those proposed for some other dealers whose occupancy costs were lower than Ferriola's.

Gulf also made efforts to maintain its franchise relationship with Ferriola: it offered to lease to him another station which, although not a good location for gasoline sales, could function as a repair station; it entered into the sublease with Rollins Sign Company in an attempt to reduce Gulf's absorption of costs; and it also modified its original rental demands and made alternative proposals at lower rents. In light of these efforts by Gulf, it is difficult to conclude that it was bargaining in bad faith.

Ferriola further contends that Gulf's arrangement with Fasgo Inc. to provide Gulf gasoline at a price substantially below that at which Gulf sold to Ferriola reflects Gulf's intention to drive him out of business. Whatever Gulf's intention, it is plain that competition from the Fasgo station did not injure Ferriola's business, because, excluding the time of the gas crisis, his volume after Fasgo began operating was largely unchanged.

In the final analysis, market forces are the cause of Ferriola's termination. When gasoline was plentiful and inexpensive, Gulf needed dealers like Ferriola and the service they provide in order to earn good will for Gulf and attract customers. Part of Gulf's cost to accomplish its aim was to absorb part of the occupancy costs of its stations. With diminishing supplies and a relatively inelastic demand for gasoline, the oil companies now require that the dealers assume the occupancy costs formerly absorbed by the company. Although there is nothing praiseworthy in Gulf's behavior in abandoning dealers who served it, there is nothing in the PMPA which prevents Gulf from making hard-line business decisions designed to minimize its cost of doing business.

## III. CONCLUSIONS OF LAW

1. The court has jurisdiction over this matter pursuant to the Petroleum Marketing Practices Act, 15 U.S.C. § 2805.

2. Defendant Gulf Oil Company gave legally adequate notice of intent to terminate its franchise with plaintiff and therefore has not violated § 2804(a) of the Petroleum Marketing Practices Act.

3. Defendant Gulf Oil Company has not violated § 202–4(4) of the Pennsylvania Gasoline Act, 73 Pa.Stat.Ann. § 202–1 *et seq.*

4. Defendant Gulf Oil Company's refusal to renew plaintiff's franchise agreement was due to inability of the parties to agree upon changes in the franchise agreement; the failure to agree occurred in the normal course of business, and not as the result of Gulf's bad faith; and accordingly Gulf has not violated § 2802 of the Petroleum Marketing Practices Act.

5. Plaintiff Larry Ferriola has not established that he is entitled to relief under the Petroleum Marketing Practices Act.