Harold **BALDAUF** and Douglas J. Lang, Plaintiffs and Counter-Defendants,

v.

**AMOCO OIL COMPANY**, a foreign corporation, Defendant and Counter-Plaintiff.

No. G 81–72.

United States District Court, W.D. Michigan, S.D.

Aug. 31, 1981.

Mark H. Cousens, Detroit, Mich., for plaintiffs and counter-defendants.

Daniel G. Wyllie, Detroit, Mich., Anthony Derezinski, Grand Rapids, Mich., for defendant and counter-plaintiff.

## OPINION

ENSLEN, District Judge.

This case involves provisions for notification of termination of non-renewal of the franchise relationship of the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq.* It is before the Court on cross Motions for Summary Judgment and Defendant's counterclaim. Plaintiffs contend that Defendant has not complied with the requirements of the Petroleum Marketing Practices Act and contest Amoco's decision to convert to their full service gas station and associated auto repair shop into a high volume "pumper" type gasoline station to the exclusion of other services. Plaintiffs argue that they have long been associated with Amoco in the operation of a full service gas station and repair shop and that Amoco in the past has encouraged this activity. In addition, Plaintiffs contend that it would not be profitable for them to eliminate the automobile repair business in order to sell gasoline on a full time basis. For these reasons, Plaintiffs urge the Court to estop Defendant from carrying out its proposal even if the terms of the Petroleum Marketing Practices Act would permit such alterations.

Congress in enacting the PMPA was concerned with contracts of adhesion unilaterally imposed on reluctant dealers by distributors. Its intention was to regulate and to limit the circumstances in which the franchisor could terminate a relationship with

the franchisee. This legislation was enacted when the relationships between franchisee and franchisors were strained as a result of the fuel shortages. However, Congress intended to be sensitive to the legitimate needs of franchisors as well as franchisees. Thus, the Court must look to the legislative history as well as to the express terms of the Act in construing its application to the case at bar.

The Act created a new term, the franchise relationship, as distinguished from the franchise itself. This term covers the broad relationship which exists between a franchisor and a franchisee by reason of the franchise agreement. It is used because the *franchise,* i.e. the *contract,* may no longer exist and it assures that the parties understand that even though the contract no longer is in effect, there may still be a viable relationship between the parties.

The parties agree that Plaintiffs have sold Defendant's products in the past and have operated a repair of motor vehicles business in a structure attached to the area utilized as a gasoline station, although they disagree about the economic effect that conversion to a "pumper" type station may have on Plaintiffs.

Defendant had not engaged in any discussion of the alteration of Plaintiffs' operations during the period of the current franchise from April 1976 until November 25, 1980 when Defendant issued a notice to Plaintiffs which indicated that Amoco desired the franchise relationship to continue upon the termination of the existing agreement, but that it intended to convert the premises to a "pumper" station. This notice explained that Plaintiffs' full time efforts would be needed to sell the volume of gasoline required to maintain a sufficient profit margin for the Defendant. (By stipulation Defendant has acceded to Plaintiffs' continuing to operate the station without prejudice to the rights of Defendant. Amoco has filed a counterclaim for possession of the property and damages.) Defendant's notice indicated that Plaintiffs would have to agree to structural changes on the premises as a condition for renewal of the franchise. Defendant expressly stated that failure to accept these changes would result in non-renewal of the franchise. While there are subordinate issues involved, the crux of the matter is whether this non-renewal complied with the requirements mandated by the Petroleum Marketing Practices Act.

15 U.S.C. § 2802(b)(3)(A) provides for the non-renewal of a franchise relationship:

(A) The failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if—

(i) such changes or additions are the result of *determinations made by the franchisor in good faith and in the normal course of business;* and

(ii) such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of preventing the renewal of the *f*ranchise relationship. (Emphasis supplied)

In their supplemental brief opposing Defendant's Motion for Summary Judgment, Plaintiffs acknowledge that Defendant has a profit motive for converting to pumper type operations:

Amoco's marketing plan is this: a dealer who operates a full-service gasoline station has two sources of income: service and repair and gasoline. Such a dealer is not as motivated towards volume sales of gasoline as is a dealer who has but one source of income. The latter dealer must sell gasoline at a lower price in order to attempt to increase volume, hoping that volume sales will increase his income. Greater volumes at a lesser profit still equal increased income.

Amoco is interested in selling volumes of its product. It, theoretically, does not set the pump price of gasoline, and its profit per gallon sold is fixed. Hence, Amoco is entirely unconcerned about the amount of profit the dealer takes, but is very concerned about volume since volume dic-

tates its profit from the location. (Plaintiffs' supplemental brief at 2–3)

Plaintiffs contend that the Act is concerned with the "bona fide" involved for each party. As Plaintiffs earned much of their income from the repair service, they allege that Defendant at least had a duty to negotiate terms in good faith when such a major change was involved, and not merely to issue a notice on a take it or leave it basis. This Court, however, is limited to interpreting the Act as it exists, together with the legislative history, in order to determine Congressional intent. Although I might desire to do so, I cannot determine the rights of the parties outside the context of the Act. Section 2802(b)(3) specifically states that if the parties fail to agree to changes or additions made by the franchisor in good faith and in the normal course of business, a ground for non-renewal exists.

In view of the number of conversions throughout the country of full service gas stations to "pumper" type operations, Amoco's decision to follow suit apparently falls into the category of being a good faith decision in the normal course of business. Good faith, however, is determined subjectively. *Munno v. Amoco Oil,* 488 F.Supp. 1114 (D.Conn.1980). Subjective good faith can be shown from objective evidence such as interoffice memos tending to constitute a demonstration of bad faith. Plaintiffs argue that, for purposes of summary judgment, Defendant has not adequately demonstrated its purpose in selecting Plaintiffs' station to convert. Amoco, however, points to a study that it conducted in 1976 analyzing sales potential of conventional stations throughout the Great Lakes if they were to be rebuilt which indicated that Plaintiffs' station, because of projected sales differentials based on traffic patterns, demographics and competition would be a prime candidate for conversion. An affidavit of the District Manager of the Saginaw District for Amoco states that Plaintiffs' gas station is only marginally profitable for Amoco as it exists and that it would fall below Amo-

co's national investment standards if the company were to continue the same operation. The affidavit further states that its study showed that Plaintiffs' station has the single most pumper gasoline potential in the Saginaw District. Therefore, the record is uncontroverted that Amoco, from its perspective, made a sound business decision in the normal course of business.

The question remains whether Amoco's profit motive is a sufficient indicia of good faith under the Act. Certainly, the course of dealing between the parties would not have led Plaintiffs to predict that Amoco would suddenly alter its manner of doing business. Plaintiffs have demonstrated that they have relied on this course of dealing for many years and have made investments, not only in time and effort, but in equipment that would be lost under the new terms. *Munno v. Amoco Oil Company, supra,* addresses the problem of determining good faith as it applied to a change in the monthly rental as a condition for renewal.

> It is beyond dispute that Amoco's decision to increase the amount of rent charged was made with subjective "good faith" and in the "normal course of business." There has been no suggestion of a bad motive or of a subterfuge aimed at driving the plaintiff from the market. While Amoco is admittedly unwilling to negotiate the amount of the monthly rent, its explanation belies any claim of bad faith. Amoco established that its other New England dealers have accepted revised rents based on the new formula, and it is concerned that if it makes an exception for the plaintiff it may be exposed to liability, presumably under the Robinson Patman Act, 15 U.S.C. § 13. *Id.* at 1117.

In *Munno,* the plaintiff's expert indicated that the rental formula was beneficial for both the dealer and the oil company. There is no consensus on mutual benefit here as Plaintiffs do not feel that they can sell the volume of gasoline required to compare with the income derived from their repair

business. The *Munno* court discussed the test for good faith further and concluded that it was an appropriate issue for summary judgment.

Construing all the facts in favor of the plaintiff, as this court must on the defendant's motion for summary judgment, *Ambook Enterprises v. Time, Inc.,* 612 F.2d 604, 611 (CA 2 1979), it is possible that a jury might find that the effect of applying the Amoco formula to the plaintiff's station would produce unreasonably harsh results. The new rental figure represents a 200–300% increase over the old rent. Furthermore, Mr. Munno testified that this increase comes at a time when his gallonage is slipping, and he is facing competition from a nearby cut-rate gasoline station. Mr. Munno contends that the increase in rent will drive him from business... It is possible that he might produce some such evidence in the event of a trial.

Thus the question for the court on summary judgment is clear. If under the PMPA proposed changes in the lease are to be tested against a subjective good faith standard, the defendant is entitled to summary judgment. If instead the test is "reasonableness", summary judgment is inappropriate. *Id.*

The *Munno* court looked into the legislative history behind 15 U.S.C. § 2802(b)(3)(A) to determine whether the words used in the statute meant "objective good faith" or whether as the defendant contended, the statute required merely a showing that the franchisor acted without impermissible motives or objectives. Finding that after Congressional hearings on the question a subjective standard was adopted as it applied to 15 U.S.C. § 2802(b)(3)(D), the *Munno* court determined that the following language was applicable to § 2802 (b)(3)(A):

At this point it is appropriate to note that considerable debate has focused upon recognition of so-called 'reasonable business judgments' of the franchisor as grounds for termination or non-renewal. This standard has not been adopted by the committee. Instead, a two-fold test has been utilized to judge certain specified determinations including that of market withdrawal.

One test is whether the determination was made 'in good faith'. This good faith test is meant to preclude sham determinations from being used as an artifice for termination or non-renewal. The second test is whether the determination was made 'in the normal course of business'. Under this test, the determination must have been the result of the franchisor's normal decisionmaking process. These tests provide adequate protection of franchisors from arbitrary or discriminatory termination or non-renewal, *yet avoid judicial scrutiny of the business judgment itself.* (Emphasis supplied)

█ I find that while changes in the conditions for renewal may produce harsh results, as indeed it appears to do in this case, Congress intended to protect the franchisee from *arbitrary* or *discriminatory* termination or nonrenewal, and did not provide a basis to examine the economic impact of an otherwise legitimate business decision by the franchisor. So long as the franchisor does not have a discriminatory motive or use the altered terms as a pretext to avoid renewal, the franchisor has met the burden required by the PMPA for determining good faith.

The major issues facing this Court relate to whether Amoco complied with the notice requirement mandated by the Act. Amoco acknowledges that it was aware of the PMPA and acted in compliance with it by sending Plaintiffs written notice on November 25, 1980, which was received by Plaintiffs on November 28, 1980, of the decision to convert upon the expiration of the lease in February, 1981. The notice stated that declining the offer of the new lease would result in turning over the premises to Amo-

co.[1] Defendant further alleges that its agent attempted to convey the copy of the new lease to the Plaintiff Lang both at home and at the location where he was hospitalized for a time but was told that Plaintiff Lang was on vacation throughout the month of February. Suit was filed on January 23, 1981. These undisputed actions show that Defendant did not intend to drive Plaintiffs out of business, although the franchise may not have been as profitable to them as before. Even though its motive may have been proper, it is true, as Plaintiffs aver, that no franchise may be nonrenewed unless it is not renewed in accordance with the terms of the Act.

To support their claim that Defendant's notice did not comply with the Act, Plaintiffs rely on § 2802(b)(3)(D)(ii), (iii) which provides a basis for non-renewal:

(D) In the case of any franchise entered into prior to June 19, 1978, (the unexpired term of which, on such date, is 3 years or longer) and, in the case of any franchise entered into or renewed on or after such date (the term of which was 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business, if—

(i) such determination is—

(I) to convert the leased marketing premises to a use other than the sale or distribution of motor fuel,

(II) to materially alter, add to, or replace such premises,

(III) to sell such premises, or-

(IV) that renewal of the franchise relationship is likely to be uneconomical

1.

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

**Amoco Oil Company**

Great Lakes Region
Post Office Box 2858
Detroit, Michigan 48231
(313) 275–5600

T. J. McJoynt
Regional Vice President

J. A. Basford
Director-Marketing

November 25, 1980
REM–2–1

SS # 5878–23
3935 W. 28th & Wilson
Grandville, MI

Harold Baldauf
95 Midland Road
Saginaw, MI 48603

Dear Sir:
Please refer to your lease dated April 30, 1976, covering the service station premises situated in the City of Grandville, County of Kent, and State of Michigan, more particularly described as follows, to-wit:
 3935 W. 28th & Wilson
 Grandville, MI
 Lease # B–19283
By its own terms, your lease will terminate effective February 28, 1981.
Amoco Oil Company is continuing to implement its cash rent policy and update its gasoline facility system.
Therefore prior to the effective date of the termination of your present lease, your Territory Manager will call upon you and to offer to continue your franchise relationship. A suc-

cessor lease, of 3 years duration under which Amoco is allowed to demolish the existing building and improvements and construct improvements deemed necessary by Amoco to convert this location to a gasoline sales only (pumper style) location, will be offered to you. Should you decide to decline the new lease offered, this letter will serve as notice that you are to deliver possession of the said premises to Amoco effective on the above termination date of your present lease, without the necessity for a subsequent notice to that effect.
Enclosed herewith is a summary statement of the Petroleum Marketing Practices Act of June 19, 1978.
 . Yours truly,
 AMOCO OIL COMPANY
 By /s/ Mitchell Simmer
Mitchell Simmer
 Real Estate Manager
MS/rb
Encl:

to the franchisor despite any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to the franchisee; (ii) with respect to a determination referred to in subclause (II) or (IV) such determination is not made for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for such franchisor's own account; and

(iii) in the case of leased marketing premises such franchisor, during the 90-day period after notification was given pursuant to section 2804 of this title, either—

(I) made a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises; or

(II) if applicable, offered the franchisee a right of first refusal of at least 45-days duration of an offer, made by another, to purchase such franchisor's interest in such premises.

As the proposed alteration in the franchise relationship involved an alteration of the premises, Plaintiffs state that Amoco may not convert the premises without giving three years notice of the change and giving the franchisee the right to purchase the premises. The language of the statute speaks of 3 year leases, but does not indicate that this 3 year lease is a condition precedent for alteration of the premises. Rather, it specifies the action that must be taken when there is a lease running for that length of time. Plaintiffs relying on *Daniels v. Dilmar Oil,* 502 F.Supp. 178 (1980) as well as on § 2802(b)(3)(D)(ii), (iii) maintain that if the decision is made in good faith and in the normal course of business, Defendant must still give the franchisee the right of first refusal if the decision to change the terms of renewal is conditioned upon alteration of the premises. *Daniels v. Dilmar Oil,* involved an injunction and was not a decision on the merits. In any event, the case was factually different from the case at hand as defendants in *Daniels* refused to renew on any terms, whereas in this instance Defendant specifically provided Plaintiffs with the opportunity to renew. Therefore, non-renewal must be based upon the failure to agree requirement of subsection (A) rather than on the franchisor's decision not to renew for reasons mentioned in subsection (D). Correspondingly, there is no right of first refusal under these circumstances.

Plaintiffs also contend that Defendant is not within the class to rely on either § 2802(b)(3)(A) or § 2802(b)(3)(D) as they apply only to those dealers having a franchise agreement with greater than three years to run or for whom a franchise of three years has been offered or expired. This is not an accurate reading of the statute. § 2802(b)(3)(A), (B), (C) and (D) provide independent grounds for non-renewal. I find that as no mention of any three year requirement is made for § 2802(b)(3)(A), the statutory notice required by § 2804 applies.

While Congress was attempting to alter the balance between producers and dealers, the extent that the statutory language, alters the relationship is interpreted by the Senate report stating the goals of the legislation.

> It is also important to note that often the reasonable expectations of the parties to a motor fuel franchise are that the relationship will be a continuing one. This expectation by the franchisee, in particular, is often the result of, and fostered by, statements and actions of the franchisor. As a result, non-renewal of a motor fuel franchise relationship at the expiration of its term can be almost as punitive as termination of the franchise during its term. The reasonable expectations of the franchisee, rather than any definitive contract rights, are destroyed.

> Just as disparity of bargaining power at the commencement of the franchise relationship may manifest itself in the utilization of termination as a remedy for contract violation, the prospect of non-re-

newal of the franchise relationship hangs over the relationship and may manifest itself during the franchise term as a means by which the franchisor may compel the franchisee to comply with the franchisor's marketing policies. Actual threats of non-renewal are not essential to the leverage the prospect of non-renewal provides a franchisor over the activities of a franchisee. The prospect is ever present and the franchisee can readily comprehend the implications of departing from the marketing policies of the franchisor, even if in some cases those marketing policies are contrary to the franchisee's economic interests. This problem is made more severe as shorter franchise periods and more frequent renewal intervals are utilized by the franchisor. The prospect of nonrenewal for *arbitrary or discriminatory grounds* threatens the independence of the franchisee as a competitive influence in the marketplace.

An essential requirement of Federal legislation is that the grounds for termination and non-renewal provided in the legislation not be so broad as to deny franchisees meaningful protections from arbitrary or discriminatory terminations and non-renewals or to prevent fulfillment of the reasonable renewal expectations of franchisees.

\* \* \* \* \* \*

Legislation in this subject area requires recognition of the legitimate needs of a franchisor to be able to terminate a franchise or not renew a franchise relationship based upon certain actions of the franchisee including certain failures to comply with contractual obligations or *upon certain changes in circumstances. Particularly important is that legislation dealing with this subject recognize the importance of providing adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences.* (Emphasis supplied) Senate Report P.L. 95–297, U.S.Code Cong. and Ad.News 873 at 876–77 (1978).

█ Perhaps the Petroleum Marketing Practices Act did not go far enough to balance the equities between franchisor and franchisee. Based on the statute and on the explanatory history, however, I am convinced that Congress intended to permit the alteration in the franchise relationship questioned here. The so-called "energy crisis" affected both franchisors and franchisees. Major oil companies were looking for economical distribution methods as a result of their increased costs of supply. Defendant claims that the public was cost conscious rather than brand conscious. Certainly, it cannot be seriously questioned that the average consumer viewed the rising price of gasoline with disfavor. Amoco's actions thus comport with practices specifically recognized in the legislative history as being acceptable. It initiated changes in its marketing practices to respond to changing market conditions. This Court, faced with the unhappy dilemma of deciding whether the PMPA mandates maintaining the status quo to the detriment of the franchisor or whether it permits alteration of the relationship to adopt to changed economic circumstances which may be adverse to the franchisee, must conclude that, within certain narrowly defined exceptions, the franchisor may act to protect its economic interest.

Plaintiffs would have the Court impose a duty to bargain in "good faith" as part of the good faith requirement of the Act. Even though they admit that *Munno, supra,* and *Pearman v. Texaco, Inc.,* 480 F.Supp. 767 (WD Mo.1979) state that it is immaterial whether the parties or the Court would have made a different business judgment or would have utilized different factors in arriving at a business decision, plaintiffs nevertheless assert that these cases should have limited value as they apply to *rent* and not to the drastic change contemplated in this action. There is dictum in *Malone v. Crown Central Petroleum,* 474 F.Supp. 306 (1979) which indicates that had the plaintiff attempted to negotiate the minimum gallonage requirements of the franchisor, the

court would have looked on his petition with greater favor. However, the court in *Malone* found though, that, plaintiff did not use his *best efforts* in conducting his business which was a contractual requirement. The franchisor may not base his decision not to renew upon specious grounds, but the Petroleum Marketing Practices Act does not require more than that the franchisee be informed of the decision in accordance with the notice requirements.

Plaintiff relies on *Ferriola v. Gulf Oil,* 496 F.Supp. 158 (1980) to support the proposition that Defendant may not cite the failure to agree to the new terms as grounds for non-renewal without giving Plaintiff the opportunity to accept or reject them. The court in *Ferriola* rejected plaintiff's contention that Gulf had not complied with the statutory notice requirements.

> If I were to adopt Florida's construction that notice must be given 90 days before the termination date specified in the lease, the franchisor would be placed in a position of giving notice of intent to terminate at the same time it was negotiating terms for a renewal of the franchise agreement to protect itself in the event that negotiations failed. Not only would this impede negotiations since the franchisee would then be negotiating 'under the gun', it would expose the franchisor to charges that it was not negotiating in good faith since it had already given notice of termination. Clearly a more reasonable construction is that if negotiations fail, the franchisee must be given at least 90 days notice in order to make whatever arrangements are necessary to cease doing business as a franchisee regardless of when the agreement expired. *Id.* at 161.

In *Ferriola,* Gulf did not begin negotiations for renewal until after the lease expired. It did not terminate the franchise in order to give the parties time to negotiate and gave notice that the franchise would terminate in 90 days after negotiations failed. While the Court in *Ferriola* was concerned with notice in the context of negotiations, it did not address whether in fact negotiations were necessary. While Plaintiffs accept the fact that the duty of the franchisor may not be as great as the duty to bargain created under the National Labor Relations Act, they argue that the PMPA requires more than passive acceptance or rejection on the part of the franchisee. Therefore, Plaintiffs characterize Amoco's action as arbitrary in violation of the Act. While the Defendant's action was unilateral and contrary to Plaintiffs' wishes, Defendant has met the test required by the Act in that it acted for a legitimate business reason in the context of changing economic circumstances, and that it did not make changes in the terms of renewal as a sham or as a pretext. The results are harsh. This Court, considering all the facts, might balance the equities otherwise if it had the power to do so. Neither the Act itself nor the legislative history provides any basis to prohibit Amoco from converting the gas station from a full service to a "pumper" type operation.

■ Plaintiffs have argued that a statement of reasons for non-renewal must be given to them so that they are apprised of these reasons in order to determine whether or not Defendant is justified under the Act in failing to renew. They contend that Defendant's letter does not meet the statutory requirements. While there is no obligation to parrot the statute, the notice should direct the franchisee to the section of the statute the franchisor relies upon so that the franchisor cannot conjure up another reason for termination after the fact. Although the notification was given to Plaintiffs more than 90 days before the termination of the lease, Plaintiffs urge the Court to consider that notice void. I find that Defendant has met the requirements of the Act. Defendant sent a letter by certified mail which stated that it was attempting to "update" its facilities, and stated what it intended to do under the new lease. Amoco also specifically offered to renew the franchise under altered conditions and stated the consequences for failure to agree. A summary statement of the Petroleum Marketing Practices Act of June 9, 1978 was included as required by law.

While the notice did not specify a section of the statute, it did indicate that a failure to agree to the new conditions would result in a termination of the franchise and giving up possession of the premises. Having issued this notice, Defendant cannot credibly conjure up other reasons for non-renewal such as failure to keep the premises clean. It is specific enough that Plaintiffs are aware of the reasons upon which the franchisor relies and knew what conditions were necessary for renewal. *Davy v. Murphy Oil Corporation,* 488 F.Supp. 1013 (WD Mich. 1980) invalidated a notice as inadequate where the notice relied on informed the franchisee that "he would be contacted to discuss the terms of a new lease." Judge Gibson ruled that this was not a "ground" specified by the Act as it was not specific and unambiguous so that plaintiff could determine whether it complied with the Act or not. Plaintiffs here can readily determine the grounds Defendant relies upon and determine whether they are permissible under the Act.

 More troublesome to the Court than the arguments discussed previously is Plaintiffs' contention that there is (or should be) an estoppel as Defendant not only acquiesced in the past to Plaintiffs' operating a repair business but actively encouraged it. Now, they assert that Defendant cannot arbitrarily change gears and prohibit this activity. Plaintiffs cite *Wesley v. Mobil Oil Corporation,* 513 F.Supp. 227 (E.D.Pa.1981) for the proposition that estoppel is permitted under the Act. In *Wesley,* the plaintiff alleged that the oil company misled him into believing that his plan to close his service station for a vacation would be tolerated even though it was a violation of the contract. The Court ruled that plaintiff was entitled to a temporary injunction. (It should be noted here that Congress relaxed the normal standard for granting a preliminary injunction in the PMPA. A plaintiff need not show extreme hardship or irreparable harm and need not show a probability of success on the merits, but need only show some reasonable chance of success on the merits. 15 U.S.C.A. § 2805(b)(2)). The legislative history, as well as the language of the Act, shows that Congress did not intend to destroy a franchisor's flexibility to meet changed economic circumstances or impair its ability to remain competitive. Thus, *Wesley* is inapplicable to the situation here.

Judge Gibson in *Drazin v. Amoco* (80 2519 W.D.Mich. Feb. 21, 1981), ruled that Congress did not intend for franchisors to have to negotiate individually with franchisees but instead that it imposed a duty to refrain from imposing conditions which were so onerous that the franchisee would not renew the franchise. While it appears unfair to permit such a drastic change in the terms of the franchise agreement when the parties have been associated for many years, it is a business risk that the franchisor might make investment decisions adverse to the franchisee. Considering the number of "pumper" stations throughout the country, the terms for renewal do not seem onerous in the context of the Act, although Plaintiffs may logically prefer not to renew on those terms.

Plaintiffs claim that the method of selection of the facilities to be converted was the subject of interrogatories and that until they are received, there is a question of fact before the Court to preclude summary judgment. Since Defendant has submitted affidavits indicating that the station was marginally profitable for Amoco and that the station would fall below Amoco's national investment standards if operated as a full service station but had the potential to produce satisfactory results as a "pumper" operation, there is no question of fact remaining before the Court which provides a basis for relief as a matter of law. Therefore, Defendant's Motion for Summary Judgment is granted and Plaintiffs' Motion for Summary Judgment is denied.

Defendant has filed a counterclaim charging unlawful detainer of the premises in contravention of the rights and privileges of Counter-Plaintiff Amoco. Amoco seeks delivery of the premises, judgment of money damages both direct and consequential, as well as costs and attorney fees.

Section 2805(d)(3) provides that the Court may, in its discretion, direct that reasonable attorney and expert witness fees be paid by the franchisee if the Court finds that such action is frivolous. The imposition of drastic changes in the renewal terms of the franchise, while permissible under the Act, takes this case out of the realm of frivolous litigation. Therefore, attorneys fees are denied.

The Court orders that delivery of the premises be given to Defendant, but as the parties have not addressed the issue of damages, it is necessary for the parties to brief this issue and to submit evidence of damages.