823 F.2d 1432
 Bill EWING and Bill Ewing Service Center, Inc., Plaintiffs-Appellees,
v.
AMOCO OIL COMPANY, Defendant-Appellant.
Bill EWING and Bill Ewing Service Center, Inc., Plaintiffs-Appellants,
v.
MOBIL OIL CORPORATION and Amoco Oil Company, Defendants-Appellees.
 Nos. 85-1655, 85-2691.
 United States Court of Appeals,
Tenth Circuit.
 July 21, 1987.
Rehearing Denied Aug. 14, 1987.
 
 Joseph W. Kennedy (Robert W. Coykendall, with him on brief), of Morris, Laing, Evans, Brock & Kennedy, Chartered, Wichita, Kan., for Amoco Oil Co.
 Robert J. O'Connor of Hershberger, Patterson, Jones & Roth, Wichita, Kan. (Robert C. Fox, Mobil Oil Corp., AMF O'Hare, Ill., and David E. Bengston of Hershberger, Patterson, with him on brief), for Mobil Oil Corp.
 Roger Sherwood (Kurt A. Harper, on brief) of Sherwood & Hensley, Wichita, Kan., for Bill Ewing and Bill Ewing Service Center, Inc.
 Before McKAY, SEYMOUR and TACHA, Circuit Judges.
 SEYMOUR, Circuit Judge.
 
 
 1
 These consolidated appeals arise from two actions brought pursuant to subchapter I of the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. Secs. 2801-2806 (1982). In case number 85-1655, Bill Ewing sued Amoco Oil Company for damages and injunctive relief, claiming that Amoco violated the PMPA by wrongfully failing to renew its gasoline service station franchise with Ewing. In 85-2691, Ewing sued both Amoco and Mobil Oil Corporation for damages, claiming that Mobil violated the PMPA when it sold Amoco the service station at which Ewing was the franchisee because Mobil failed to ensure that Amoco offered Ewing in good faith a new franchise with nondiscriminatory terms. In 85-1655, we affirm the granting of a preliminary injunction. In 85-2691, we reverse the granting of summary judgment in favor of Mobil and affirm it in favor of Amoco.
 
 I.
 
 2
 In May 1983, Mobil announced its intention to withdraw from the marketing of petroleum products in a large area of the midwest. One of the service stations affected by this decision was operated by Bill Ewing, a Mobil franchisee. Amoco offered to purchase nine of Mobil's service stations, including the station operated by Ewing. After a period of negotiations, Mobil and Amoco executed a sales contract that specifically obligated Amoco to offer new franchises to Mobil's old franchisees as follows:
 
 
 3
 "Amoco shall offer such lessees, in good faith, a lease and ancillary product sales agreement (i.e., a franchise) on terms and conditions which are not discriminatory as compared to franchises currently being offered by Amoco."
 
 
 4
 Rec., No. 85-2691, vol. I, doc. no. 23, exh. E (hereinafter Sales Contract). In November 1983, Mobil informed Ewing of the sale of his service station to Amoco and of Amoco's agreement to offer Ewing an Amoco franchise.
 
 
 5
 The parties agree that a franchise relationship between Ewing and Amoco began in May 1984, the same time that Ewing's previous franchise with Mobil ended. Numerous factual disputes remain, however, regarding the nature and intended duration of the Ewing-Amoco franchise. In general, Amoco offers one-year trial franchises to all new franchisees. Current Amoco franchisees, and those new franchisees who survive the one-year probationary period, are offered franchises with three-year terms.
 
 
 6
 As part of the terms of its agreement with Ewing, Amoco required him to undergo a "3-D" renovation of his service station. A 3-D station is one with full-service pumps, self-service pumps, and a convenience store. All 3-D stations are required to remain open twenty-four hours per day. According to the unrefuted testimony of several Amoco employees, Amoco's decision to convert a particular station to 3-D operations rested solely on various economic factors, such as the size of the market and the relative proximity of other Amoco stations. However, current Amoco franchisees, i.e., those with three-year franchises, are given a choice whether to undergo 3-D conversions. New Amoco franchisees are not given such an option. Ewing was treated as a new franchisee and required to have his station renovated and to remain open twenty-four hours per day if he chose to continue working at his station after it was purchased by Amoco. Amoco did not require all of the former Mobil franchisees to undergo these changes in order to become Amoco franchisees.
 
 
 7
 During a portion of the summer of 1984 and at several times during the remainder of 1984, Ewing failed to operate his station twenty-four hours per day. In February 1985, Amoco informed Ewing that it had decided not to renew his franchise, which Amoco claimed would expire in May 1985. In its notice of nonrenewal, Amoco stated that the reason for nonrenewal was Ewing's failure to operate twenty-four hours per day.
 
 II.
 No. 86-1655
 
 8
 After receiving notice from Amoco that his franchise would not be renewed, Ewing brought suit against Amoco, claiming that the nonrenewal of his franchise violated the PMPA. Amoco argued that, beginning in May 1984, it entered into a one-year trial franchise with Ewing, and that the PMPA allows a franchisor to terminate or refuse to renew a trial franchise for any reason whatsoever. Ewing claimed that his relationship with Amoco did not satisfy the PMPA's requisites for a trial franchise.[1] Ewing also argued that, even if their relationship was a trial franchise, the PMPA does not allow Amoco to fail to renew the franchise for arbitrary or pretextual reasons.
 
 
 9
 The trial court granted Ewing a preliminary injunction under which Ewing was allowed to continue to operate his service station. In its order granting the injunction, the court determined that Amoco had intended from the outset of its relationship with Ewing to terminate his franchise. Without deciding whether the parties' agreement constituted a trial franchise, the court held that even such a franchise requires valid reasons for nonrenewal. According to the court, the failure of Ewing to operate twenty-four hours per day was not a valid reason because, during the summer of 1984, Ewing was unable to operate those hours due to the service station renovations, and because Amoco, at the time it decided not to renew the franchise, was not aware of the other occasions that Ewing's station had been closed.
 
 
 10
 On appeal, Amoco challenges the trial court's holding that the PMPA requires "valid" reasons for the termination of a trial franchise. The PMPA operates generally to allow franchisors to terminate or fail to renew most franchises only for certain enumerated reasons and only after complying with detailed notice requirements. See 15 U.S.C. Secs. 2802,[2] 2804. The statute also allows parties to enter into "trial" franchises under certain circumstances. See 15 U.S.C. Sec. 2803. The provisions of the PMPA that expressly restrict the ability of franchisors to terminate or fail to renew, 15 U.S.C. Sec. 2802(b), do not apply to trial franchises, see 15 U.S.C. Sec. 2803(a). Amoco argues, therefore, that a franchisor may refuse to renew a trial franchise for any reason at all.
 
 
 11
 The trial court did not decide whether the parties entered into a trial franchise, and, as discussed below, the propriety of the preliminary injunction does not depend on the presence or absence of such a finding. Because, after further fact findings, the trial court may determine that the franchise is not a trial one, we see no need to decide at this point the extent to which the statute may limit the franchisor's ability not to renew a trial franchise.[3]
 
 
 12
 We turn then to the propriety of the preliminary injunction. Under the PMPA, a trial court is directed that it
 
 
 13
 "shall grant a preliminary injunction if--
 
 
 14
 (A) the franchisee shows--
 
 
 15
 (i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and(ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and
 
 
 16
 (B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted."
 
 
 17
 15 U.S.C. Sec. 2805(b)(2) (emphasis added).
 
 
 18
 Several salient features of this provision are worth noting. First, granting an injunction is not discretionary with the trial court. If it finds that the statutory standards are satisfied, it must grant the injunction. Second, the standards for granting an injunction are more lenient than the standards under Fed.R.Civ.P. 65. Under Rule 65, the movant must demonstrate that (1) there is a substantial likelihood of success on the merits; (2) irreparable injury will result if the injunction is not granted; (3) the threatened injury to the movant outweighs whatever damage an injunction would cause the opposing party; and (4) an injunction would not be adverse to the public interest. Lundgrin v. Claytor, 619 F.2d 61, 63 (10th Cir.1980).[4] Under section 2805(b)(2), however, the movant need only show that the "balance of hardships preponderates in favor of the franchisee," see Gilderhus v. Amoco Oil Co., 470 F.Supp. 1302, 1304 (D.Minn.1979); see also Khorenian v. Union Oil Co., 761 F.2d 533, 535 (9th Cir.1985) ("greater hardship" standard not difficult for franchisee to establish in most PMPA cases), and that "there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation," 15 U.S.C. Sec. 2805(b)(2)(A)(ii). This latter requirement has been interpreted to require less of a showing of likely success than is generally required under Rule 65. See, e.g., Moody v. Amoco Oil Co., 734 F.2d 1200, 1216 (7th Cir.), cert. denied, 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 321 (1984); Walters v. Chevron U.S.A., Inc., 476 F.Supp. 353, 355 (N.D.Ga.1979), aff'd, 615 F.2d 1135 (5th Cir.1980) (per curiam).
 
 
 19
 In addition, overlaying the very liberal injunction provisions of the PMPA is section 2805(c), which provides that
 
 
 20
 "[i]n any action under subsection (a) of this section, the franchisee shall have the burden of proving the termination of the franchise or the nonrenewal of the franchise relationship. The franchisor shall bear the burden of going forward with evidence to establish as an affirmative defense that such termination or nonrenewal was permitted under section 2802(b) or 2803 of this title."
 
 
 21
 15 U.S.C. Sec. 2805(c). In other words, in any PMPA action, including an action for an injunction, the franchisor bears the burden of establishing its compliance with the statute. See Khorenian, 761 F.2d at 535.
 
 
 22
 In light of the foregoing standards, we conclude that the trial court was correct to grant a preliminary injunction. First, Ewing's franchise relationship with Amoco has not been renewed. Second, not granting an injunction would impose more hardship on Ewing than granting an injunction imposes on Amoco. If the franchise had been allowed to expire, Ewing would have lost the income from his service station, which is his livelihood. On the other hand, there is no evidence that Amoco is significantly harmed by having its station continue to be operated by Ewing. Finally, we believe that Ewing has presented "sufficiently serious questions going to the merits to make such questions a fair ground for litigation." 15 U.S.C. Sec. 2805(b)(2)(A)(ii). For example, if the trial court determines on remand that the parties' relationship does not constitute a trial franchise, then serious questions regarding the sufficiency of Amoco's reasons for nonrenewal remain for litigation. On the other hand, if the court finds that their relationship was a trial franchise, it remains an open question whether the statute may nevertheless restrict the reasons that will justify nonrenewal. The trial court must also determine whether the timing and content of Amoco's notice of nonrenewal satisfied the statute. See 15 U.S.C. Secs. 2802(b), 2803, 2804. On remand, Amoco will bear the burden of establishing both that a trial franchise existed and that its reason for and notice of nonrenewal complied with the PMPA.
 
 
 23
 Accordingly, we affirm the granting of a preliminary injunction and remand 85-1655 for further proceedings.
 
 III.
 No. 85-2691
 
 24
 In Ewing's action against Mobil and Amoco as joint defendants, Ewing claims that Mobil did not fully comply with the PMPA provisions that allow a franchisor to withdraw from retail marketing in a particular geographic area. Under section 2802(b)(2)(E), a franchisor such as Mobil may terminate a franchise relationship based upon
 
 
 25
 "a determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located."
 
 
 26
 In the case of leased service stations such as Ewing's, one of three things must occur for the withdrawing franchisor to comply with this section: (1) the franchisor offers to sell the premises to the franchisee; (2) the franchisor grants the franchisee a right of first refusal in the sale of the premises to another; or (3) if the franchisor sells the station to another,
 
 
 27
 "such other person offers, in good faith, a franchise to the franchisee on terms and conditions which are not discriminatory to the franchisee as compared to franchises then currently being offered by such other person or franchises then in effect and with respect to which such other person is the franchisor."
 
 
 28
 15 U.S.C. Sec. 2802(b)(2)(E)(iii)(II).
 
 
 29
 Mobil neither offered to sell the premises to Ewing nor granted Ewing a right of first refusal. Thus, in order for Mobil to establish that it complied with section 2802(b), it must show that Amoco offered "in good faith, a franchise to [Ewing] on terms and conditions which are not discriminatory" as compared to other Amoco franchises. Ewing claims that the Amoco franchise discriminated against him because he was forced to undergo the 3-D renovations and to operate twenty-four hours per day, whereas established Amoco franchisees are given the option whether to convert to 3-D operations, and some former Mobil franchisees were not required to convert. Ewing also contends that if in fact Amoco offered him only a one-year trial franchise, this was discriminatory because existing Amoco franchisees are given three-year franchises and are thus protected by the express restrictions on termination and nonrenewal contained in section 2802(b).[5]
 
 
 30
 Both defendants moved at trial for summary judgment. The trial court concluded that there was no genuine issue of fact regarding discrimination and granted defendants' motions. In reviewing a summary judgment order, an appellate court applies the same standard employed by the trial court under Fed.R.Civ.P. 56(c). United States v. Gammache, 713 F.2d 588, 594 (10th Cir.1983). Under Rule 56(c), summary judgment is proper only if it is apparent from the record that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party carries the burden of showing beyond a reasonable doubt that it is entitled to summary judgment, and the court must review the record in the light most favorable to the opposing party. See Weir v. Anaconda Co., 773 F.2d 1073, 1079 (10th Cir.1985).
 
 
 31
 Our reading of the statute tells us that Mobil cannot establish its compliance with the market withdrawal provisions without first demonstrating that Amoco offered Ewing a franchise whose terms were nondiscriminatory as compared to the terms Amoco was giving its own comparable franchisees. Thus, in our view, if the franchisee of the seller is a regular franchisee, then the seller must require the purchaser to give the franchisee a regular franchise in order to comply with section 2802(b)(2)(E)(iii)(II).
 
 
 32
 Several factors support this interpretation of the statute. First, the statute states that the franchise terms must be nondiscriminatory as compared to both "franchises then currently being offered" by the purchaser and "franchises then in effect and with respect to which [the purchaser] is the franchisor." 15 U.S.C. Sec. 2802(b)(2)(E)(iii)(II) (emphasis added). The term "franchises then in effect" includes the franchises of which Amoco was already the franchisor at the time of the purchase of Ewing's station. See Southern Nevada Shell Dealers Ass'n v. Shell Oil Co., 634 F.Supp. 65, 71 (D.Nev.1985).
 
 
 33
 Second, one of Congress' primary purposes in enacting the PMPA was to protect franchisees against arbitrary and discriminatory terminations or nonrenewals. See S.Rep. No. 731, 95th Cong., 2d Sess. 15, 17, reprinted in 1978 U.S.Code Cong. & Admin.News 873, 874, 875-76. A longstanding franchisee has a legitimate expectation that the franchise relationship will be a continuing one. Id. at 18, 1978 U.S.Code Cong. & Admin.News 873 at 876. The statute is thus directed in part at "protecting the buildup of goodwill by those individuals who have invested time and money into the operation of a franchise." Brewer v. Exxon Corp., 626 F.Supp. 76, 79 (E.D.Tenn.1985). It is only the established--i.e., non-trial--franchisee who receives the full protections of the statute against arbitrary termination and nonrenewal. If the purchaser of a station were permitted to offer the seller's former longstanding franchisee only a one-year trial franchise, the franchisee would be severely disadvantaged by the transaction, a result that we believe Congress did not intend. On the other hand, if the purchaser of a station is required to offer the seller's former franchisee a franchise of the same duration as those offered the purchaser's current franchisees (which cannot be a trial franchise, see 15 U.S.C. Sec. 2803(b)(1)(B)), the long-standing franchisee will continue to receive the full protections of the statute.
 
 
 34
 The market withdrawal provisions of the statute support this interpretation. The selling franchisor must (1) offer to sell the station to the franchisee, (2) grant the franchisee a right of first refusal, or (3) ensure that a third-party purchaser offers the franchisee a nondiscriminatory franchise in good faith. We believe that the first two options evince Congress' intent that the franchisee be afforded the fullest protection of its interests possible. If the franchisee, who before the sale was fully protected by the statute, could be converted under option three to a mere trial-franchise status with only its limited protections, this would unjustifiably circumvent the protections afforded by the other two options.
 
 
 35
 Ewing first argues that his franchise was discriminatory because not all the former Mobil franchisees were required to undergo 3-D conversions. We are convinced, however, that Congress did not intend "not discriminatory" to mean that each service station operator must be offered a franchise with identical terms. A franchisor must be free to offer different terms at different franchise locations, depending on the economic conditions and forecast for that area. See Baldauf v. Amoco Oil Co., 553 F.Supp. 408, 411 (W.D.Mich.1981) (conversion from full-service to high-volume pumper station legitimate business decision under section 2802(b)(3)(A)), aff'd, 700 F.2d 326 (6th Cir.1983) (per curiam); Pearman v. Texaco, Inc., 480 F.Supp. 767, 771 (W.D.Mo.1979) (change in rental rates legitimate business decision). The record is devoid of evidence that the decision to convert Ewing's station was anything other than a legitimate business decision based solely on economic considerations.
 
 
 36
 Ewing also contends that his franchise was discriminatory as compared to the franchises granted to current Amoco franchisees. We believe that the differences between the terms offered to Ewing and those in effect with Amoco's established franchisees are sufficient to raise a genuine issue regarding discrimination. As noted previously, Ewing may have been given only a one-year trial franchise which, without the express statutory protections that would accompany a three-year franchise, would constitute a significant disadvantage. In addition, Ewing was forced to undergo a 3-D conversion, whereas current Amoco franchisees with three-year terms are given an option regarding such changes. The record before us fails to demonstrate as a matter of law that these forms of discrimination were justifiable under the statute. We therefore conclude that summary judgment in favor of Mobil was improperly granted.[6]
 
 
 37
 We also conclude that summary judgment in 85-2691 was appropriate in favor of Amoco. The market withdrawal provisions of the PMPA, 15 U.S.C. Sec. 2802(b)(2)(E), establish the duties of the selling franchisor only and do not provide a cause of action against the purchasing franchisor.
 
 IV.
 
 38
 In 85-2691, we reverse the grant of summary judgment with respect to Mobil and affirm it with respect to Amoco. We affirm the preliminary injunction in 85-1655. Both cases are remanded for further proceedings.
 
 
 
 [1]
 Trial franchises under the PMPA are available only to those parties who have never previously been in a franchise relationship. See 15 U.S.C. Sec. 2803(b)(1)(B). Ewing claimed that he began his franchise relationship with Amoco in May, when his previous franchise with Mobil ended, but that the Amoco trial franchise documents were not formally executed until July. Thus, he argued, he was already an Amoco franchisee under an oral agreement at the time the purported trial franchise began. Accordingly, claimed Ewing, their relationship did not fall within the PMPA's trial franchise provisions. The trial court did not resolve this issue at the preliminary injunction stage
 
 
 [2]
 Section 2802(b) allows franchisors to either terminate or fail to renew a franchise for only five specified reasons: (1) the franchisee's failure to comply with a material and reasonable provision of the franchise; (2) the franchisee's failure to exert good faith efforts to carry out the provisions of the franchise; (3) the occurrence of an event that is relevant to the franchise relationship and that makes termination or nonrenewal reasonable; (4) an agreement between franchisor and franchisee to terminate or not to renew; and (5) a good faith business decision by the franchisor to withdraw from retail marketing in a specific geographic area. See 15 U.S.C. Sec. 2802(b)(2)(A)-(E). Section 2802(b) also allows nonrenewal of a franchise for the following additional reasons: (1) the failure of franchisor and franchisee to agree to changes or additions to franchise provisions; (2) the receipt of numerous customer complaints about the franchisee; (3) the franchisee's failure to operate the station in a clean, safe, and healthful manner; and (4) under certain circumstances, a good faith business decision by the franchisor to convert, sell, or alter the business premises, or a determination that the franchise relationship cannot economically be continued. See 15 U.S.C. Sec. 2802(b)(3)(A)-(D)
 
 
 [3]
 Although the limitations on the grounds for nonrenewal contained in Sec. 2802(b) are expressly inapplicable to trial franchises, see 15 U.S.C. Sec. 2803(a), it is an open question whether the statute may otherwise restrict the trial franchisor's ability to terminate or fail to renew. The notice provisions of Sec. 2804(c), for example, apply equally to trial franchises and regular franchises and require the franchisor to inform the franchisee of the reasons for nonrenewal. Ewing contends that if a trial franchisor were able to decline to renew for any reason whatsoever, Congress would not have required notice of such reason. To the extent that Sec. 2804(c) could be construed to require "valid," or at least "nonpretextual," reasons, even a trial franchisor would be restricted in its reasons for nonrenewal. Cf. Clark v. Mobil Oil Corp., 496 F.Supp. 132, 134-36 (E.D.Mo.1980) (failure to state reason in nonrenewal notice causes franchisor to lose benefit of trial franchise provisions), aff'd, 652 F.2d 2 (8th Cir.1981) (per curiam). Because the trial court may determine on remand that a trial franchise did not exist, however, we decline to decide this issue
 
 
 [4]
 In this circuit, if the last three factors are satisfied, the movant need only demonstrate that there are sufficiently serious questions going to the merits to present a fair ground for litigation. Lundgrin, 619 F.2d at 63
 
 
 [5]
 As we noted in Part II, whether in fact the franchise agreement between Amoco and Ewing is a trial franchise is an issue that has not been resolved
 
 
 [6]
 Mobil argues that it fulfilled its obligations under the statute by obtaining contractual assurances from Amoco that it would offer Ewing a nondiscriminatory franchise in good faith. We note, however, that the contract between Amoco and Mobil did not specifically require the new Amoco franchises to be nondiscriminatory as compared to Amoco franchises "then in effect." Compare 15 U.S.C. Sec. 2802(b)(2)(E)(iii)(II) with Sales Contract, supra p. 1434. Thus, Amoco's compliance with the contract would not, without more, ensure Mobil's compliance with the statute. We need not decide what effect, if any, more complete contractual assurances would have on Mobil's statutory liability