W. Fred TILLER, Jr., Plaintiff,

v.

AMERADA HESS CORPORATION,
Defendant.

William J. COOLEY, Jr., Plaintiff,

v.

AMERADA HESS CORPORATION,
Defendant.

James Denny FLOYD, Plaintiff,

v.

AMERADA HESS CORPORATION,
Defendant.

Gene D. McALISTER, Plaintiff,

v.

AMERADA HESS CORPORATION,
Defendant.

Civ. A. Nos. 81–1652–3, 81–1653–3,
81–1752–3 and 81–1753–3.

United States District Court,
D. South Carolina,
Greenville Division.

Nov. 12, 1981.

**162**

S. Jahue Moore, West Columbia, S.C., for plaintiffs.

O. G. Calhoun, Jr., Haynsworth, Perry, Bryant, Marion & Johnstone, Greenville, S. C., for defendant.

## ORDER

GEORGE ROSS ANDERSON, Jr., District Judge.

Plaintiffs in the above-styled cases, operating service stations for the Defendant, Amerada Hess Corporation [Hess], bring this suit under the Petroleum Marketing Practices Act [P.M.P.A.] of 1978, 15 *U.S.C.* § 2801, *et. seq.* The cases were consolidated for the purposes of a preliminary injunction hearing which was held before me on October 13th and 14th, 1981. The factual basis for the injunctive relief is not in dispute. The Plaintiffs' Complaints and their Motions for a Preliminary Injunction are based upon a letter which Hess delivered to each Plaintiff on or about the 27th of July, 1981, notifying each dealer that a new lease agreement was being proposed which contained an increase in rent. The new rent figures represented a substantial increase over the amount of rent the Plaintiffs were paying under the present lease. The Plaintiffs contend that the magnitude of the rent increase, together with Hess' refusal to negotiate its insistence of enlarging the hours of operation, and the placing of additional restrictions upon the use of the premises, were not done in good faith in the normal course of business. Plaintiffs further contend these actions violate the P.M.P.A. and they are entitled to a preliminary injunction.

Hess argues the Plaintiffs are not entitled to preliminary injunctive relief by relying upon the fact that the new rental structure was apparently adopted pursuant to a rational, nondiscriminatory rent formula. Hess further asserts that the new rent structure was applied equally to all franchisees, including Plaintiffs, on a company-wide basis, which resulted in increased rentals for some franchisees and reductions for others. Hess finally contends Plaintiffs are precluded from the benefits of a preliminary injunction as a matter of law.

Plaintiff Tiller operates the Hess service station located at 969 South Church Street, Greenville, South Carolina. This station is designated by Hess as Station No. 40255.

Plaintiff Cooley operates the Hess service station located at 4306 Augusta Road, Greenville, South Carolina. This station is designated by Hess as Station No. 40236.

Plaintiff Floyd operates the Hess service station located at U. S. Highway 123 and College Avenue, Clemson, South Carolina. This station is designated by Hess as Station No. 40244.

Plaintiff McAlister operates the Hess service station located at 3002 North Main Street, Anderson, South Carolina. This station is designated by Hess as Station No. 40227.

All four (4) Plaintiffs have run their respective service stations for a substantial period of time. It is admitted that the dealers have operated their stations in a proper manner during the years they have leased the stations from Hess.

Hess holds fee simple title to the property it leases to Cooley, Floyd and McAlister. Hess holds a ground lease on the property it leases to Tiller who possesses the property by virtue of a sublease from Hess.

The Plaintiffs contend the proposed lease agreement with new rent structure is a subterfuge calculated to defeat the intent and purpose of the P.M.P.A. On the contrary, Hess contends its actions were done in good faith based upon sound business consideration.

### FINDINGS OF FACT

1. Since 1970, the following is the average monthly rental which has been paid on the stations in question:

| YEAR | COOLEY | TILLER | FLOYD | McALISTER |
|------|--------|--------|-------|-----------|
| 1970 | $1,177 | $ 691 | $ 832 | $1,359 |
| 1971 | 1,305 | 683 | 1,312 | 1,550 |
| 1972 | 1,825 | 1,016 | 1,809 | 2,053 |
| 1973 | 1,560 | 836 | 1,556 | 1,574 |
| 1974 | 1,867 | 1,175 | 1,066 | 1,559 |
| 1975 | 1,447 | 848 | 1,079 | 1,109 |
| 1976 | 1,444 | 883 | 1,041 | 917 |
| 1977 | 1,384 | 899 | 1,181 | 1,065 |
| 1978 | 1,150 | 713 | 1,077 | 906 |
| 1979 | 974 | 599 | 842 | 765 |
| 1980 | 979 | 590 | 799 | 743 |

2. Under the current and proposed lease arrangement with its franchisees, Hess places certain substantial restrictions on the manner in which the stations are to be operated. Some of these restrictions are, as follows:

(1) The dealers are permitted to sell only Hess brand of gasoline and oil;

(2) No repair work is permitted on the premises;

(3) No truck or trailer rentals are permitted on the premises;

(4) No tires, batteries or accessories are to be sold on the premises;

(5) No food will be sold on the premises; and

(6) Vending machines are only allowed when authorized and approved by Hess.

3. Prior to the new rent structure contained in the proposed lease agreement, Hess charged rent based upon the number of gallons of gasoline pumped at the particular location each month.

4. The proposed lease was to be unconditionally accepted within thirty (30) days. Failure to so accept would be treated by Hess as a nonrenewal and Plaintiffs would be ordered to vacate the premises.

5. The Plaintiffs were not informed of the method by which the new rent structure was formulated at the time the proposed lease was tendered for acceptance. Moreover, Plaintiff Cooley specifically requested this information which Hess continuously failed to provide until the hearing on the preliminary injunction. This raises a factual issue concerning Hess' good faith under the P.M.P.A.

6. The new rental structure in the proposed lease agreement is based upon the following considerations and computations which were made in the normal course of business:

(a) Hess selected an independent real estate appraiser to appraise each of the properties in question, as if unimproved, based upon its highest and best use;

(b) Hess utilized an "in house" appraisal of the replacement costs of all improvements on one (1) station located in New Jersey and then, based upon this one appraisal, estimated the replacement costs for the improvements at each station where the lease was up for renewal; and

(c) Hess calculated the annual rate of rent by taking the sum of the value of the unimproved land *plus* the replacement costs of all improvements at each site and multiplying that figure by eight percent (8%). Monthly rent is then calculated as one-twelfth ($\frac{1}{12}$) of the annual rent.

7. In arriving at this rental formula, Hess gave no consideration to its actual out-of-pocket investment at each station or the restrictions it had placed upon Plaintiffs' use of the stations. The Plaintiffs' stations were not appraised individually concerning the alleged replacement costs of the improvements thereon. Moreover, Hess decided to calculate the new rent based partially upon the "replacement costs" of the improvements on each site; yet, the record is devoid of any evidence that any improvements need replacing. These provide a factual issue for a jury in determining whether Hess acted in good faith.

**164**

8. Under the proposed lease agreement the new flat rental rate would be as follows:

(a) Tiller would be required to pay a flat rental rate of $1,783.00 per month, representing an increase of $1,193.00 per month over the average rental paid in 1980. This represents an increase of 202.20%;

(b) Cooley would be required to pay a flat rental rate of $2,174.00 per month, representing an increase of $1,195.00 per month over the average rental paid in 1980. This represents an increase of 122.06%.

(c) Floyd would be required to pay a flat rental rate of $2,188.00 per month, representing an increase of $1,389.00 per month over the average rental paid in 1980. This represents an increase of 173.84%; and

(d) McAlister would be required to pay a flat rental rate of $2,019.00 per month, representing an increase of $1,267.00 per month over the average rental paid in 1980. This represents an increase of 171.74%.

9. At the time the new lease agreement was presented by Hess, three of the dealers were told that existing vending machines would have to be removed from the premises. There is some question as to whether or not this provision was rescinded by Hess immediately before or immediately after these lawsuits were filed. This would also present a factual issue for a jury in determining the good faith of Hess.

10. Additionally, when the new lease agreements were presented to the Plaintiffs, Hess told them the new operating hours of the stations would be twenty-four (24) hours per day, seven (7) days per week. Only Plaintiffs Tiller, Floyd and McAlister challenged the twenty-four (24) hour provision in their Complaints. Hess, however, subsequently sent each of them a letter rescinding the twenty-four (24) hour per day, seven (7) days a week provision. Hess required that the stations remain open eighteen (18) hours a day from 6:00 A.M. until 12:30 A.M. Tiller maintained the eighteen (18) hour requirement was unreasonable due to the lack of business at his particular location after 9:30 P.M. Hess attempted to refute Tiller's assertion by introducing a traffic count made at his station.

Again, the mere fact that Hess attempted to impose a twenty-four (24) hour per day, seven (7) day per week condition in the proposed lease, and Hess' subsequent modification of the requirement, would certainly be an issue of fact for a jury in determining whether or not Hess acted in good faith under the P. M. P. A.

11. Hess made a policy decision not to open any more dealer operated stations sometime in 1974. All new stations, and any dealer operated station where the lease is not renewed, will be owned and operated by the Hess Corporation. Hess' decision to phase out dealer operated stations is also an issue of fact for a jury determining whether Hess acted in good faith.

12. The new rent structure has been applied in a uniform manner to all stations and appears to be valid on its face. While this constitutes evidence of good faith on the part of Hess, *it is not conclusive* on the issue of good faith under the P. M. P. A.

13. One hundred thirty-five (135) out of one hundred forty-one (141) Hess dealers have agreed to the new rentals and signed the proposed lease. Again, while this is evidence of apparent good faith, it is not conclusive on that issue.

## CONCLUSIONS OF LAW

1. The P. M. P. A., 15 *U.S.C.* § 2805(b)(2), provides where a franchisee has been terminated or his franchise relationship has not been renewed, the court shall grant a preliminary injunction if, *inter alia,* "there exists sufficiently serious questions going to the merits to make such questions a fair ground for litigation." To obtain preliminary injunctive relief under this standard, the Plaintiffs must demonstrate that they have a reasonable chance of prevailing on the merits and, on balance, the hardships imposed upon the Plaintiffs

without the injunction are greater than the potential harm to the Defendant if the injunction is granted. *Daniels v. Dilmar Oil Co.*, 502 F.Supp. 178 (D.C.S.C.1980); *Pearman v. Texaco, Inc.*, 480 F.Supp. 767 (W.D. Mo.1979); *Gilderhus v. Amoco Oil Co.*, 470 F.Supp. 1302 (D.C.Minn.1979); and *Saad v. Shell Oil Co.*, 460 F.Supp. 114 (E.D.Mich. 1978).

2. The P. M. P. A., 15 *U.S.C.* § 2802(b)(3)(A), permits a franchisor, such as Hess, not to renew a franchise relationship in the following circumstances:

"(3) For the purposes of this subsection, the following are grounds for nonrenewal of a franchise relationship:

(A) The failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if . . .

(i) such changes or additions are the result of determinations made by the franchisor *in good faith and in the normal course of business* ; and

(ii) such failure is *not* the result of the franchisor's insistence upon such changes or additions *for the purpose of preventing the renewal of the franchise relationship.*" (emphasis added)

3. The legislative history of the P. M. P. A., as well as the pertinent case law, establishes that good faith within the meaning of the statute means the franchisor's "subjective good faith," and not the objective reasonableness of the franchisor's acts, nor the alleged impact of those acts on any particular franchisee. Senate Report No. 95–731, 95th Cong., 2d Sess., 37, *reprinted in* 1978 U.S.Code Cong. and Admin.News, pp. 873, 895–96 [Senate Report]; *Thompson v. Kerr-McGee Refining Corp.*, 660 F.2d 1380 (10th Cir. 1981); *Ferriola v. Gulf Oil Corp.*, 496 F.Supp. 158 (E.D.Pa.1980); *Munno v. Amoco Oil Co.*, 488 F.Supp. 1114 (D.Conn.1980); and *Pearman v. Texaco, Inc., supra.*

4. In enacting § 2802(b)(3)(A), Congress considered and rejected language which would have required a "reasonableness" test for franchise termination. After hearings, Congress adopted the "good faith" test and the language clearly refers to the subjective intent of the franchisor. The relevant Senate Report provides:

"At this point it is appropriate to note that considerable debate has focused upon recognition of so-called 'reasonable business judgments' of the franchisor as grounds for termination or non-renewal. *This standard has not been adopted by the committee.* Instead, a two-fold test has been utilized to judge certain specified determinations . . .

"One test is whether the determination was made 'in good faith.' This good faith test is meant *to preclude sham determinations from being used as an artifice for termination or non-renewal.* The second test is whether the determination was made 'in the normal course of business.' Under this test, the determination must have been the result of the franchisor's normal decisionmaking process. *These tests provide adequate protection of franchisees from arbitrary or discriminatory termination or non-renewal, yet avoid judicial scrutiny of the business judgment itself.*" (Emphasis added) Senate Report, pp. 873, 895–96.

██ 5. Questions of subjective intent are considered proper issues for the jury and bad faith may be inferred from the circumstances involved in the particular case. As a matter of necessity, subjective intent is usually a matter of inference to be derived from all of the objective facts and evidence. See: *Daniels v. Dilmar Oil Co., supra, Munno v. Amoco Oil Co., supra,* and *Pearman v. Texaco, Inc., supra.*

██ 6. While the uniform application of a rent increase is evidence of good faith on the part of the franchisor, it is in and of itself not conclusive on the issue of good faith under the P. M. P. A. See: *Ferriola v. Gulf Oil Corp., supra; Munno v. Amoco Oil Co., supra;* and *Pearman v. Texaco, Inc., supra.*

██ 7. The Court concludes from the manner in which the new rent structure was formulated, from the policy decisions of Hess concerning the phasing out of dealer operated stations, and from the manner in

which the proposed lease agreement was promulgated, it can be reasonably inferred that the new rental structure in the proposed lease agreement was a mere subterfuge and that Hess acted in bad faith in attempting to force the dealer-operator/Plaintiffs out of business contrary to the intent and purpose of the P. M. P. A.

8. The Court further concludes, based on the foregoing, that the Plaintiffs have made a sufficient showing of a reasonable chance of prevailing on the merits. In balancing the potential hardships of the respective parties, the Court finds that the potential harm to the Plaintiffs without an injunction issuing is greater than the potential harm to the Defendant with such an injunction. Without a preliminary injunction, the Plaintiffs are effectively precluded from doing business and will lose their major source of income. Furthermore, Plaintiffs would be forced to dismiss their present employees, causing great economic hardship to all concerned. On the contrary, the Defendant is a large oil corporation with substantial assets and will continue to receive revenue from the operation of the Plaintiffs' stations while the preliminary injunction is in effect. The Defendant argues its Gasoline Sales Division (including the appropriate real estate holdings and improvements) should be evaluated as an independent profit center rather than as a functional unit of the corporation. It is common knowledge in the business community that some corporate divisions may be less profitable than others, but they are equally essential to the successful operation of the corporation. Therefore, the Court examines the Defendant's Gasoline Sales Division in relation to the totality of the Amerada Hess Corporation, and concludes the effect of the preliminary injunction, if any, would be negligible. Moreover, the Defendant concedes that all Plaintiffs operate their respective stations in an acceptable manner. Taking into account Hess' apparent satisfaction with the Plaintiffs' manner of operation for the past several years, little, if any, potential harm will result until this matter can be tried on the merits.

NOW, THEREFORE, it is

ORDERED that the Defendant be and it hereby is preliminarily enjoined from terminating Plaintiffs leases and the parties shall continue in business with the Plaintiffs in possession of the service stations in question under the existing dealer agreements until further order of this Court.

IT IS SO ORDERED.