**Ronald J. RADECKI and Radecki's Service, Inc., a Minnesota corporation, Plaintiffs,**

v.

**AMOCO OIL COMPANY, a Maryland corporation, Defendant.**

**Civ. No. 3–83–487.**

United States District Court,
D. Minnesota,
Third Division.

May 12, 1986.

Wayne A. Hergott, and Patrick F. Flaherty, Moss & Barnett, and Randy V. Thompson, and Gary E. Persian, Smith & Persian, Minneapolis, Minn., for plaintiffs Ronald J. Radecki and Radecki's Service Inc.

Rita A. McConnell, and Alfred H. Edwall, Robins, Zelle, Larson & Kaplan, Minneapolis, Minn., and Maurice R. Glover, and Dale M. Iwataki, Amoco Corp., Chicago, Ill., for defendant Amoco Oil Co.

## MEMORANDUM AND ORDER

MAGNUSON, District Judge.

Plaintiffs Ronald J. Radecki and Radecki's Service, Inc. (collectively referred to as Radecki) commenced this lawsuit against defendant Amoco Oil Company (Amoco) under the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. §§ 2801–2806, on April 20, 1983. Radecki is a franchisee of Amoco and operates a traditional full-service retail Amoco station at 1099 Grand Avenue in St. Paul, Minnesota. A traditional full-service station is a station which sells not only gasoline, but also provides repair and towing services and sells tires, batteries, and accessories (which are commonly referred to in the trade as TBA). Amoco owns the station and certain equipment, such as the pumps, gasoline tanks, hoist and compressor, as well as the premises and has continuously leased them to Radecki or his father since the 1930s. A series of leases has governed the franchise relationship between Amoco and Radecki with the most recent lease dated April 25, 1980. That lease agreement by its own terms was to have expired on June 30, 1983.

In August 1981, Amoco informed Radecki that it would consider selling its service station and premises at 1099 Grand Avenue to him. Amoco subsequently forwarded various proposed sale documents to Radecki in September 1981 for his review and consideration. Radecki obtained legal counsel to review the documents and made the necessary arrangements for financing the sale. In November 1981, however, Amoco informed Radecki that it was no longer interested in selling the station and premises and the sale was never consummated. In December 1982, Radecki learned that Amoco intended to convert its full-service station at 1099 Grand Avenue into a pumper with demolition of the existing station and construction of the pumper to begin in August 1983. A pumper is a station which sells gasoline and possibly convenience foods and other items and offers a car wash, but provides no auto repair or towing services and no TBA on the

premises. At about the same time that Radecki learned of the intended pumper conversion, Amoco offered on December 22, 1982 to renew its franchise relationship with Radecki under a new lease agreement for a period of three years commencing upon expiration of the existing lease on June 30, 1983. The new lease agreement differed most significantly from the existing lease with the deletion of Paragraph 17[1] and the addition of a rider relating to conversion of the premises (the pumper rider).[2] After considerable analysis and investigation on Radecki's part and discussions with Amoco, Radecki concluded that he could not enter into the new lease agreement with the pumper rider, though he could enter into the new lease agreement without the pumper rider. On March 30, 1983, Amoco informed Radecki by letter that it was terminating and nonrenewing the lease agreement and franchise relationship with Radecki effective June 30, 1983. The stated reason for termination and nonrenewal as required under the PMPA was the failure of Amoco, as franchisor, and Radecki, as franchisee, to agree to changes or additions to the provisions of the franchise.

Radecki subsequently commenced this lawsuit under the PMPA seeking injunctive relief to require Amoco to make a bona fide offer to sell the station and premises to him or to renew the existing franchise without the pumper rider, and seeking actual and punitive damages. The lawsuit was assigned to this court which, on June 7, 1983, issued a preliminary injunction pursuant to § 105(b)(2) of the PMPA, 15 U.S.C. § 2805(b)(2), enjoining Amoco from nonrenewing and terminating Radecki's franchise and from converting the station and premises at 1099 Grand Avenue into a pumper pending trial of this lawsuit on the merits. On January 5, 1984, the court denied the Cross-Motions for Summary Judgment of Amoco and Radecki and declined at that time to determine whether § 102(b)(3)(A) or § 102(b)(3)(D) of the PMPA, 15 U.S.C. § 2802(b)(3)(A) and § 2802(b)(3)(D) (hereinafter referred to as § 2802(b)(3)(A) and § 2802(b)(3)(D)), applies to this case preferring to have the facts more fully developed before making such a determination. The matters now before the court are the renewed Cross-Motions for Summary Judgment of Amoco and Radecki to determine whether § 2802(b)(3)(A) or § 2802(b)(3)(D) applies to this case and,

1. Paragraph 17 of the Lease Agreement dated April 25, 1980 between Amoco and Radecki provided that:

   17. Lessor [Amoco] reserves the right to alter, modify, rebuild or rehabilitate the premises at any time during the term of this lease for a business of a gasoline sales facility, with or without service bays, in Lessor's sole discretion. Lessor shall give Lessee [Radecki] sixty (60) days' notice of its intent to do so. During the time required to complete the work Lessor shall pay to Lessee, in full settlement to Lessee for all damages, losses, costs and inconvenience suffered by Lessee and Lessee's employees and agents as a result of any interruption of Lessee's business by the work, a sum computed as follows: (1) for every business day that the station shall remain open for business during the construction, the sum shall equal fifty per cent (50%) of one-thirtieth (1/30) of the monthly rental; and (2) for every business day that the station shall be closed by the construction, the sum shall equal one hundred per cent (100%) of one-thirtieth (1/30) of the monthly rental plus $25. Upon completion of the modification, rebuild or rehabilitation of the premises, the rental

rate set forth in Paragraph 3 shall be adjusted to conform to Lessor's prevailing rental rate in effect for the particular size and type of facility in the market.

2. The pumper rider would allow Amoco to convert the station and premises at 1099 Grand Avenue into a pumper upon 30 days written notice to Radecki. The pumper rider provided in pertinent part that Radecki would consent to the closing of his service station business as necessary to allow the premises to be converted to a pumper. The pumper rider also provided that Radecki would not be obligated to pay rent while the service station business was closed due to conversion, but, conversely, would waive all claims against Amoco arising in connection with the interruption of his business as a result of the conversion. The pumper rider provided finally that, upon completion, Radecki would pay a monthly rental which Amoco would determine according to an "established rental policy." The "established rental policy" was not stated in the pumper rider or otherwise provided to Radecki.

depending which section applies, whether judgment can be entered as a matter of law.

Radecki contends that § 2802(b)(3)(D) applies to this case because Amoco seeks to nonrenew its franchise relationship with him as a result of a determination "to materially alter, add to, or replace" its station and premises at 1099 Grand Avenue. Radecki concedes that the attempt of Amoco to nonrenew their franchise relationship arose in the context of a purported "failure ... to agree to changes or additions to the provisions of the franchise" involving the new lease agreement with the pumper rider (which Amoco seizes upon to argue that § 2802(b)(3)(A) applies to this case). Radecki believes, however, that when Amoco approached him with the new lease agreement with the pumper rider the decision to convert the full-service station and premises at 1099 Grand Avenue to a pumper was but a *fait accompli*. That is, the decision "to materially alter, add to, or replace" the station and premises at 1099 Grand Avenue was made before "the failure ... to agree to changes or additions to the provisions of the franchise." Consequently, Radecki believes that the determination of Amoco to materially alter and convert the station and premises to a pumper, not the failure of Amoco and himself to agree to changes and additions in the new lease agreement with the pumper rider, motivated Amoco to nonrenew their franchise relationship and § 2802(b)(3)(D) should therefore apply.

Radecki asks the court to focus not on the attempt of Amoco to create a failure to agree in these circumstances, but on the determination of Amoco to materially alter the station and premises to a pumper. Radecki contends that Amoco offered him renewal under the terms and conditions of the new lease agreement with the pumper rider, which were to him so onerous as to make acceptance personally and economically impossible, in order to create an apparent failure to agree between Amoco and himself which would provide Amoco with a basis to nonrenew under § 2802(b)(3)(A). Radecki contends that Amoco structured its dealings with him in this way in a transparent attempt to circumvent § 2802(b)(3)(D) and the rights which he would be accorded under that provision, including the right in the case of a material alteration to purchase the station and premises from Amoco. Radecki concludes that Amoco should not be allowed to vitiate the rights which the PMPA provides to him, the franchisee, *vis-a-vis* Amoco, the franchisor. Radecki asks the court to find that § 2802(b)(3)(D) applies to this case and that Amoco has violated § 2802(b)(3)(D) as a matter of law, and to order injunctive relief requiring Amoco to comply with § 2802(b)(3)(D).

Amoco contends that § 2802(b)(3)(A) applies to this case because Amoco and Radecki failed "to agree to changes or additions to the provisions of the franchise." Amoco contends that it conducted extensive market studies in the Twin Cities in the late 1970s and early 1980s which indicated that, in order to meet changing retail gasoline market conditions and satisfy consumer preferences, it would have to convert a number of traditional full-service stations and premises to pumpers, including the station and premises Radecki operates. Having decided to convert some of its full-service stations and premises in the Twin Cities to pumpers, Amoco believes that it could deal with its franchisees in the context of renewal in one of two ways under the PMPA. Amoco could work within the framework of the franchise and offer the franchisee renewal under the terms of changes or additions to the provisions of the franchise which authorize the conversion of the station and premises to a pumper. Alternatively, Amoco could decide not to renew the franchise because of its determination to materially alter the station and premises by conversion to a pumper and offer to sell the station and premises to the franchisee. Amoco believes that if it offers to renew the franchise under changed or additional provisions, then § 2802(b)(3)(A) applies and the franchisee can either accept the franchise with the changed or additional provisions and continue the franchise relationship or reject the franchise and risk nonrenewal. Amoco further believes that if it decides not to

renew the franchise because of a determination to materially alter the station and premises by conversion to a pumper, then § 2802(b)(3)(D) applies and Amoco must make the franchisee a bona fide offer to sell the station and premises which the franchisee may accept but which will cause the franchisee to lose the franchise. Amoco contends that because it offered to renew the franchise with Radecki, albeit with changes and additions to provisions of the franchise including the new lease agreement with the pumper rider, and Amoco and Radecki failed to agree to those changes and additions, § 2802(b)(3)(A) applies to this case. Amoco asks the court to find that § 2802(b)(3)(A) applies to this case and that as a matter of law Amoco acted in good faith and in the normal course of business and not for the purpose of preventing the renewal of the franchise relationship.

The PMPA was enacted on June 19, 1978 in an effort to address what Congress perceived to be the "natural tensions" which often arise in the unique and complex franchise relationship between the franchisor and the franchisee in the petroleum industry. *See* S.Rep. No. 95–731, 95th Cong., 2d Sess. 17, *reprinted in* 1978 U.S.Code Cong. & Ad.News 873, 875–77. These "natural tensions", Congress found, led to franchisees' complaints of unfair terminations or nonrenewals of their franchises for arbitrary or discriminatory reasons or franchisors' threats of termination or nonrenewal to compel franchisees to comply with the marketing policies of the franchisor. At the heart of these "natural tensions" was the absolute disparity of bargaining power which exists between the franchisor and the franchisee—a disparity which frequently results in virtual contracts of adhesion. Considerable friction resulted between the franchisors and the franchisees stirring in Congress the concern that the retail gasoline distribution and marketing system of the Nation was threatened. Consequently, Congress enacted the PMPA in order to remedy the disparity of bargaining power between the franchisors and the franchisees and to establish uniform guidelines regarding the franchise relationship.

The PMPA attempted to provide "a set of rules [which] would clearly define the rights and obligations of the parties to the franchise relationship in the crucial area of termination of a franchise or non-renewal of the franchise relationship." *Id.* at 877.

Congress enacted the PMPA after having extensively reviewed what it found to be the state of terminations and nonrenewals between franchisors and franchisees in the retail gasoline industry. With respect to termination, Congress found that "[t]ermination is an extreme remedy ... [which] ... is fundamentally punitive and not compensatory in nature." *Id.* at 876. Congress also found that, due to the disparity of bargaining power between the franchisor and the franchisee, the franchisor often obtained great flexibility with respect to the right to terminate the franchise even for the most technical or minor violation of the contract. Congress, while questioning the franchisor's repeated resort to termination even for technical or minor contract violations, acknowledged that termination may be an appropriate remedy for some contract violations, especially those violations which are so serious as to undermine the entire franchise relationship. With respect to nonrenewal, Congress found that "non-renewal of a motor fuel franchise relationship at the expiration of its term can be almost as punitive as termination of the franchise during its term" given that the reasonable expectations of the parties, often due to the franchisor's statements and actions, are that the relationship will be a continuing one. *Id.* Congress also found that

> just as disparity of bargaining power at the commencement of the franchise relationship may manifest itself in the utilization of termination as a remedy for contract violations, the prospect of non-renewal of the franchise relationship hangs over the relationship and may manifest itself during the franchise term as a means by which the franchisor may compel the franchisee to comply with the franchisor's marketing policies.

*Id.* at 877.

Congress noted that the prospect of nonrenewal alone provides the franchisor with

tremendous leverage over the activities of the franchisee. Consequently, in light of the state of terminations and nonrenewals between franchisors and franchisees in the retail gasoline industry, Congress made it "[a]n essential requirement of [the PMPA] that the grounds for termination and non-renewal provided in the [Act] not be so broad as to deny franchisees meaningful protection from arbitrary or discriminatory terminations and non-renewals or to prevent fulfillment of the reasonable renewal expectations of franchisees." *Id.*

The PMPA seeks to strike a balance, albeit a complex and delicate one, between the often conflicting, if not competing, interests of the parties to the franchise relationship. The balance struck in the PMPA recognizes the threat which arbitrary or discriminatory terminations or nonrenewals pose to "the independence of the franchisee as a competitive influence in the marketplace" and the needs of the franchisor to be able to terminate a franchise or nonrenew a franchise relationship as a result of certain actions of the franchisee or certain changes in circumstances, including changes in market conditions and consumer preferences. *Id.* In striking the balance, the PMPA

> establishes protection for franchisees from arbitrary or discriminatory termination or non-renewal of their franchises. The [Act] prohibits a franchisor from terminating a franchise during the term of the franchise agreement and from failing to renew the relationship at the expiration of the franchise term, unless the termination or non-renewal is based upon a ground specified or described in the [Act] and is executed in accordance with the notice requirements of the [Act].

*Id.* at 874.

The operative phrases in this framework of the PMPA are "the termination of a franchise" and "the nonrenewal of a franchise relationship." A "franchise" means any contract between a distributor and a retailer for the distribution of a branded motor fuel and the lease of marketing premises for such distribution. *See* 15 U.S.C. § 2801(1)(A)(iv) and (1)(B)(i). A "franchise relationship" means the respective obligations and responsibilities of the franchisor and the franchisee that result from the marketing of motor fuel under a franchise. *See* 15 U.S.C. § .2801(2).

Among the grounds for termination or nonrenewal specified in the Act, assuming compliance with the notice requirements, are the failure of the franchisee to comply with reasonable and material provisions of the franchise, the failure of the franchisee to make good faith efforts to carry out the franchise provisions, the occurrence of an event relevant to the franchise relationship which makes termination or nonrenewal of the franchise relationship reasonable, a written agreement between the franchisor and franchisee to terminate or nonrenew, and the franchisor's decision to withdraw from the retail gasoline market in the relevant geographic market area. *See* 15 U.S.C. §§ 2802(b)(2)(A), (B), (C), and (D). Additional grounds for nonrenewal include the failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, the franchisor's receipt of numerous bona fide customer complaints concerning the franchisee's operation, and the franchisee's failure to operate the station and premises in a clean, safe, and healthful manner. *See* 15 U.S.C. §§ 2802(b)(3)(A), (B), and (C). A final ground for nonrenewal is the franchisor's determination in good faith and the normal course of business to convert the leased premises to a use other than the sale of motor fuel, to materially alter, add to, or replace the premises, to sell the premises, or that renewal of the franchise relationship would likely be uneconomical to the franchisor despite any reasonable changes or additions to the provisions of the franchise which might be acceptable to the franchisee, provided that certain requirements are satisfied including a bona fide offer to sell, transfer, or assign to the franchisee the franchisor's interest or offer the franchisee a right of first refusal. *See* 15 U.S.C. § 2802(b)(3)(D). If the franchisor fails to comply with the requirements of the PMPA with respect to termination of a franchise or nonrenewal of a franchise relationship, the franchisee may maintain a civ-

il action against the franchisor seeking equitable relief, actual damages, exemplary damages, and reasonable attorney and expert witness fees. *See* 15 U.S.C. § 2805(a), (b)(1), and (d)(1).

The issue before the court in these Cross-Motions for Summary Judgment, as Amoco and Radecki agree, is simply stated: Whether § 2802(b)(3)(A) or § 2802(b)(3)(D) applies to the nonrenewal of the franchise relationship between Amoco and Radecki. Section 2802(b)(3)(A) provides that the following is a basis for nonrenewal of a franchise relationship:

(A) The failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if—

(i) such changes or additions are the result of determinations made by the franchisor in good faith and in the normal course of business; and

(ii) such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of preventing the renewal of the franchise relationship.

15 U.S.C. § 2802(b)(3)(A).

Section 2802(b)(3)(D) provides that the following is also a basis for nonrenewal of a franchise relationship:

(D) In the case of any franchise entered into prior to June 19, 1978, (the unexpired term of which, on such date, is 3 years or longer) and, in the case of any franchise entered into or renewed on or after such date (the term of which was 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business, if—

(i) such determination is—

(I) to convert the leased marketing premises to a use other than the sale or distribution of motor fuel,

(II) to materially alter, add to, or replace such premises,

(III) to sell such premises, or

(IV) that renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to the franchisee;

(ii) with respect to a determination referred to in subclause (II) or (IV), such determination is not made for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for such franchisor's own account; and

(iii) in the case of leased marketing premises such franchisor, during the 90-day period after notification was given pursuant to [15 U.S.C. § 2804], either—

(I) made a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises; or

(II) if applicable, offered the franchisee a right of first refusal of at least 45 days duration of an offer, made by another, to purchase such franchisor's interest in such premises.

15 U.S.C. § 2802(b)(3)(D).

The court believes that, in light of the plain language of the statute and its extensive legislative history, § 2802(b)(3)(A) should apply to this case. Amoco offered to renew its franchise relationship with Radecki but under changed or additional provisions of the franchise, including the new lease agreement with the pumper rider. The franchise relationship between Amoco and Radecki was nonrenewed only after Amoco and Radecki failed to agree to changes or additions to the provisions of the franchise, that is, Radecki refused to agree to the pumper rider as a provision of the franchise. Having failed to agree to changes or additions to provisions of the franchise, such as the new lease agreement with the pumper rider, § 2802(b)(3)(A) properly applies to the nonrenewal of the franchise relationship between Amoco and Radecki. *See Valentine v. Mobil Oil Corp.*, 614 F.Supp. 33, 37 (D.Ariz.1984); *Baldauf v. Amoco Oil Co.*, 553 F.Supp. 408, 414 (W.D. Mich.1981).

■ The court, in deciding whether § 2802(b)(3)(A) or § 2802(b)(3)(D) applies in this case, is faced with a difficult choice. The court must choose between whether the PMPA mandates maintaining the status quo of the franchise and franchise relationship to the economic detriment of the franchisor or whether it permits alteration of the franchise and franchise relationship in light of changed market and economic conditions to the personal and economic hardship of the franchisee. *See Bauldauf v. Amoco Oil Co.*, 553 F.Supp. 408, 415 (W.D.Mich.1981). The court must reluctantly conclude that the PMPA allows the franchisor to alter the franchise and franchise relationship, even if the result is particularly severe or harsh to the franchisee who may have been associated with the franchisor for many years, in response to changed market and economic circumstances, provided that this alteration is the result of a decision which the franchisor made in good faith and in the normal course of business, and not for the purpose of preventing the nonrenewal of the franchise relationship. The court notes that Radecki's claims of constructive termination, economic hardship, and other onerous consequences which confront him in the new lease agreement with the pumper rider, and which the court accepts as true for purposes of these motions, did not fall on deaf ears. Unfortunately, these claims come to the court in the context of a statute with its legislative history as it now exists and not what it should be or what Radecki would like it to be. Perhaps the PMPA failed in its attempt to balance fairly the equities between the franchisor and the franchisee in the retail gasoline industry and perhaps the court in this case would balance the equities otherwise if it had the power to do so. *Id.* at 414–15. But the court cannot remedy what may be the failure of Congress to balance fairly the equities in the PMPA or strike a different balance under the PMPA in this case. The court is limited to reviewing the nonrenewal in this case in light of § 2802(b)(3)(A) which protects the franchisee from arbitrary or discriminatory termination or nonrenewal, not personal and economic hardship, at the hands of the franchisor. In the end, Radecki and similarly situated franchisees will have to seek from Congress any different balancing of the equities between franchisors and franchisees under the PMPA. *See Valentine v. Mobil Oil Corp.*, 614 F.Supp. 33, 39 (D.Ariz.1984).

That the franchisor can act to alter the franchise and franchise relationship to its benefit in response to changed market and economic circumstances, even to the detriment of the franchisee, is consistent with and permissible under the PMPA and its legislative history. Congress specifically noted, in its discussion of franchise protection and remedying the disparity of bargaining power between franchisors and franchisees, that legislation dealing with the franchise and franchise relationship in the retail gasoline industry must "recognize the importance of providing adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences." S.Rep. No. 95–731, 95th Cong., 2d Sess. 17, *reprinted in* U.S.Code Cong. & Ad.News 873, 877. Congress further noted, in its discussion of "taking" of property and potential Fifth Amendment problems, its intent to provide franchisors with flexibility. Congress, noting that the franchisor is required to renew the franchise relationship unless a grounds for termination or nonrenewal exists under the PMPA, stated that:

Because the renewal of the franchise relationship may be on different terms or conditions, the franchisor is afforded the opportunity to restructure his consideration under the franchise agreement to compensate him for the prospective loss of flexibility occasioned by the application of the provisions of this [Act] to any future termination of the franchise. In this regard, it should be noted that one ground for a non-renewal of the franchise relationship is the failure, under certain circumstances, of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise. Thus, there should be no basis for a claim of unconstitutional taking of

property without compensation because the franchisor may achieve compensation for any loss of valuable contract rights through changes in contractual consideration he receives under the franchise agreement.

The contract right which it is alleged amounts to a property right, the taking of which may be prohibited by the Fifth Amendment, represents but one form of contractual consideration which the franchisor obtains under the existing franchise agreement. Thus, the flexibility, which the contractually-granted right of termination represents, comprises only part of the consideration received by the franchisor in return for the contractual obligations undertaken by him. The loss of such flexibility may be offset by other forms of consideration the franchisor may be able to obtain through renewal of the franchise relationship upon modified terms or conditions. Moreover, if the franchisor and the franchisee cannot agree on modifications of the franchise agreement, a ground for nonrenewal of the franchise relationship may exist as provided in section 102(b)(3)(A) [15 U.S.C. § 2802(b)(3)(A) ].

*Id.* at 890–91.

Congress, as the legislative history of the PMPA evidences, intended to tread as lightly as possible on the contractual rights and freedom of the franchisor in its franchise relationship in the retail gasoline industry. In so doing, Congress apparently intended that the franchisor be able to alter the franchise and franchise relationship in response to changed market and economic conditions provided that such alteration is not arbitrary or discriminatory.

█ Where Amoco has provided Radecki with the opportunity to renew under a new lease agreement and nonrenewal occurs because of a failure to agree to changes or additions to the provisions of the franchise, such nonrenewal must satisfy the requirements of § 2802(b)(3)(A). Having found that § 2802(b)(3)(A) applies in this case, the remaining issue,[3] in the context of these

Cross-Motions for Summary Judgment, is whether it can be said as a matter of law that:

1. The changes or additions that Amoco sought to introduce to the provisions of the franchise with Radecki were the result of determinations which Amoco made in good faith *and* in the normal course of business; and

2. The failure of Amoco and Radecki to agree to the changes or additions to the provisions of the franchise was not the result of the insistence of Amoco upon such changes or additions for the purpose of preventing the renewal of the franchise relationship.

The determinations of Amoco which resulted in the introduction of changes or additions to the provisions of the franchise and its subsequent nonrenewal are judged with reference to a two-pronged test.

One test is whether the determination was made "in good faith". This good faith test is meant to preclude sham determinations from being used as an artifice for termination or non-renewal. The second test is whether the determination was made "in the normal course of business". Under this test, the determination must have been the result of the franchisor's normal decisionmaking process. These tests provide adequate protection of franchisees from arbitrary or discriminatory termination or non-renewal, yet avoid judicial scrutiny of the business judgment itself. Thus, it is not necessary for the courts to determine whether a particular marketing strategy, such as a market withdrawal, or the conversion of leased marketing premises to a use other than the sale or distribution of motor fuel, is a wise business decision.

*Id.* at 896.

In evaluating franchisor determinations under § 2802(b)(3)(A), a "good heart" or subjective good faith on the part of the franchisor is generally all that is required. *Roberts v. Amoco Oil Co.,* 740 F.2d 602, 606 (8th Cir.1984); *Brach v. Amoco Oil*

---

**3.** The parties do not dispute that Amoco complied with the notice requirements of the PMPA in its nonrenewal of Radecki. *See* 15 U.S.C. § 2804.

*Co.*, 677 F.2d 1213, 1222 (7th Cir.1982). The evaluation under § 2802(b)(3)(A) of the franchisor's determinations which resulted in the changes or additions to the provisions of the franchise is intended to reveal whether the franchisor has offered the franchisee the changes or additions to the franchise as a result of an arbitrary or discriminatory motive or as a pretext or sham to avoid renewal. *See Valentine v. Mobil Oil Corp.*, 614 F.Supp. 33, 38–39 (D.Ariz.1984); *Baldauf v. Amoco Oil Co.*, 553 F.Supp. 408, 412 (W.D.Mich.1981); *Munno v. Amoco Oil Co.*, 488 F.Supp. 1114, 1119 (D.Conn.1980).

■ Subjective good faith under the PMPA means the court must look "to the franchisor's intent rather than to the effect of its actions." *Munno v. Amoco Oil Co.*, 488 F.Supp. 1114, 1119 (D.Conn.1980). The court is not to look to "the objective reasonableness of the franchisor's acts [or] the alleged impact of those acts on any particular franchisee." *Tiller v. Amerada Hess Corp.*, 540 F.Supp. 160, 165 (D.S.C.1981) (citations omitted). Subjective good faith need not be proved or refuted with direct evidence of an actual state of mind. *Munno v. Amoco Oil Co.*, 488 F.Supp. 1114, 1120 (D.Conn.1980). Subjective good faith is usually a matter of inference to be derived from all of the objective facts and evidence. *Id.; Tiller v. Amerada Hess Corp.*, 540 F.Supp. 160, 165 (D.S.C.1981). Consequently, in order to establish bad faith, the franchisee need not elicit a confession of impermissible motive from the franchisor. Rather, objective evidence, such as inter-office memoranda or documents, prior disputes or events between the parties, and the manner in which the changes and additions to the provisions of the franchise were promulgated or presented, may constitute circumstantial proof giving rise to an inference of bad faith. *Id.* The franchisor, it should be noted, has the burden of proving that its determinations which resulted in the changes or additions to the provisions of the franchise were made in good faith and in the normal course of business, and not for the purpose of preventing the renewal of the franchise relationship. *See* 15 U.S.C. § 2805(c).

■ Although the court finds that § 2802(b)(3)(A) applies to this case, the court cannot say that as a matter of law the requirements of § 2802(b)(3)(A) have been satisfied. The court has considered the rather voluminous record which has been provided for the purpose of these motions and appreciates the time and effort which the parties and their counsel have expended in preparing the matter for hearing. A review of this record in light of the requirements of § 2802(b)(3)(A) convinces the court that a number of genuine issues of material fact remain which make this matter inappropriate for summary judgment. The court believes that the issues under § 2802(b)(3)(A) of whether the determinations of Amoco which resulted in the changes or additions to the provisions of the franchise were made in good faith, whether such determinations were made in the normal course of business, and whether the changes or additions to the provisions of the franchise were insisted upon for the purpose of preventing the renewal of the franchise relationship are best left to the trier of fact after a trial on the merits.

Accordingly, IT IS ORDERED that:

The Cross-Motions for Summary Judgment of plaintiffs Ronald J. Radecki and Radecki's Service, Inc. and defendant Amoco Oil Company be denied.

**CHRIS N., Plaintiff,**

v.

**BURNSVILLE, MINNESOTA, a political subdivision, and John Does 1–10, Defendants.**

**Civ. No. 4–85–1423.**

United States District Court, D. Minnesota, Fourth Division.

May 13, 1986.

Charles S. Zimmerman and Barry G. Reed, Zimmerman, Caplan & Reed, Minneapolis, Minn., for plaintiff.

Kirk A. Stubbee and John T. Chapman, Arthur, Chapman, Michelson & McDonough, Minneapolis, Minn., for defendants.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on defendants' motion to dismiss. Defendants' motion will be denied.

### FACTS

Before the Court is defendants' motion to dismiss in one of the so-called "strip search" cases. Plaintiff was detained by city of Burnsville police July 2, 1982. Plaintiff, dressed only in shorts and a tee shirt, gave a ride on his motorcycle to an acquaintance. The destination was the passenger's automobile. Upon reaching the automobile plaintiff was confronted by several Burnsville city police officers with weapons drawn. The police arrested plaintiff's passenger for suspected theft. Although the police concededly had no reason to suspect plaintiff of wrongdoing, plaintiff was also arrested, detained, and subjected to a full strip search. The search allegedly included a visual body cavity search. Plaintiff thereafter brought this suit pursuant to 42 U.S.C. § 1983, alleging deprivation of his rights under the fourth, fifth, eighth, ninth, and fourteenth amendments to the United States Constitution, and seeking actual damages of $50,000, punitive damages of $100,000, costs and fees.

Defendants now bring this motion to dismiss, on the ground that plaintiff's cause of action is time-barred. Resolution of this issue turns on whether the Supreme Court's recent decision in *Wilson v. Garcia*, —— U.S. ——, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), is to be applied retroactively in the circumstances presented by the case at bar.[1]

1. The question of *Wilson's* retroactivity is one which has split the courts. To date, decisions holding that *Wilson* is to be applied retroactively include: *Jones v. Preuit & Mauldin,* 763 F.2d 1250 (11th Cir.1985); *Mulligan v. Hazard,* 777 F.2d 340 (6th Cir.1985); *Rivera v. Green,* 775 F.2d 1381 (9th Cir.1985); *Fitzgerald v. Larson,* 769 F.2d 160 (3d Cir.1985); *Smith v. City of Pittsburgh,* 764 F.2d 188 (3d Cir.1985); *Bartholomew v. Fischl,* 782 F.2d 1148 (3d Cir.1986); *Gobla v. Crestwood School District,* 628 F.Supp.

43 (M.D.Pa.1985); *Snowden v. City of Carbondale,* 613 F.Supp. 1207 (S.D.Ill.1985); *Van Ryn v. County of Franklin,* 614 F.Supp. 400 (S.D.Ill. 1985); and the Eighth Circuit trilogy of *Wycoff, Bolton,* and *Farmer,* discussed *infra.*

618 F.Supp. 722 (N.D.Cal.1985); *Moore v. Floro,* 614 F.Supp. 328 (N.D.Ill.1985); *Ruley v. Nelson,* 106 F.R.D. 514 (D.Nev.1985).

**2.** As the Third Circuit explained in *Smith,* "[t]he courts of appeals were generally divided between two different approaches ...:

The fundamental point of disagreement in selecting a statute of limitations for civil rights actions is whether such claims should be characterized in terms of the specific facts generating a particular suit, or whether a more general characterization of such claims should be applied regardless of the discrete facts involved."

*Smith,* 764 F.2d at 192, *quoting Garcia v. Wilson,* 731 F.2d 640, 648 (10th Cir.1984) (en banc), *aff'd,* — U.S. —, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985).

**3.** *See Wilson,* 105 S.Ct. at 1945.

**4.** *See Wilson,* 105 S.Ct. at 1947.

**5.** *See Wilson,* 105 S.Ct. at 1947.