**Roger STRASHEIM, individually and d/b/a Roger's Standard, Plaintiff,**

v.

**AMOCO OIL COMPANY, a Maryland corporation, Defendant.**

**No. 84 C 10132.**

United States District Court, N.D. Illinois, E.D.

April 29, 1987.

Paul E. Slater, Sperling, Slater & Spitz, Chicago, Ill., Randy V. Thompson, Smith & Persian, Minneapolis, Minn., for plaintiff.

Thomas O. Kuhns, Philip S. Beck, Kirkland & Ellis, Thomas Ciechanowski, Amoco Oil Co., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

This matter is now before the court on the motion of plaintiff Roger Strasheim for preliminary injunctive relief, pursuant to Section 105(b)(2) of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2805(b)(2). Strasheim requests that the court order defendant Amoco Oil Co. ("Amoco") to continue its franchise relationship with Strasheim under the terms of

the parties' August 19, 1981 franchise agreement until further order of this court. The Magistrate held a hearing on Strasheim's motion for preliminary injunctive relief, and, on June 7, 1985, issued a Report and Recommendation urging the court to grant Strasheim's motion. On June 24, 1985, Amoco filed objections to, essentially, all of the Magistrate's Report and Recommendation. This court now sets forth the following findings of fact and conclusions of law.

## I. Facts

Strasheim, an Illinois resident, operates an Amoco service station in Arlington Heights, Illinois. Strasheim sells gasoline and automobile-related products at the station, and also services and repairs automobiles in three service bays or garages at the station. Strasheim has operated the station for over thirteen years. Strasheim continues to operate the station at the present time pursuant to an agreement between Strasheim and Amoco to maintain the status quo without prejudice to the rights or claims of either party pending this court's decision on the motion for preliminary injunctive relief.

Amoco is a Maryland corporation with its executive headquarters in Chicago, Illinois. Amoco refines, distributes and sells petroleum and related products throughout the United States.

Amoco owns the service station in Arlington Heights which Strasheim operates. Amoco and Strasheim have entered into various franchise agreements since Strasheim began operating the station. The franchise agreements include a service station lease, a dealer supply agreement, and other related documents. *See, e.g.,* Exhibits "A" and "C" to Strasheim's Complaint.

Strasheim's automobile repair and maintenance business has always been an important part of his operation of the station. For example, in 1984, Strasheim's income from the service and repair business totaled approximately $60,000. Strasheim's repair and maintenance business has always been contemplated by, and in accordance with, the franchise agreements between the parties.

In March, 1984, Amoco Territory Manager William Limbach informed Strasheim that Amoco had decided to convert the Arlington Heights station from a full-service station to a "pumper," a station with self-service islands and a food shop. Pumpers sell gasoline at a price lower than that charged at full-service stations for gasoline, and usually sell a greater volume of gas than do full-service stations. Amoco charges all franchisees the same price for gasoline; therefore, pumper franchisees have a lower per gallon profit margin on gasoline than do full-service franchisees. According to Limbach, Amoco planned to demolish the existing Arlington Heights structure and build on the premises a small convenience food store facility and self-service islands. The new structure would not include service garages, and space for the towing of automobiles or the sale of automobile parts and products would be severely limited.

In a letter sent by certified mail and dated May 11, 1984, Amoco informed Strasheim that his current franchise agreement would expire on November 30, 1984, that Amoco would propose a new agreement in which it would, for the first time, reserve the right to convert the station to a pumper, and that, should Strasheim fail to agree to the new provision in the agreement, Amoco would not renew the agreement with Strasheim, effective December 1, 1984. Amoco attached to the letter provisions of the PMPA, as required. *See* Exhibit "B" to Strasheim's Complaint.

Limbach met with Strasheim again in the late spring or early summer of 1984, at which time Limbach provided Strasheim with projections of the investment required in, and the income expected from, the station as operated as a pumper. Limbach projected that Strasheim would initially have to invest approximately $60,000 in order to begin operating the pumper, and could expect to realize a pre-tax annual profit of approximately $66,000. Testimony at the hearing on this motion established that Amoco gave all similarly situated Amoco franchisees the same investment and income projections.

Strasheim presented evidence at the hearing indicating that Amoco's profit projections were inflated and not in good faith. First, at the time Limbach presented the projections to Strasheim, Amoco had in its possession a study by its outside consultant, Ancillary Enterprises, dated June 24, 1983, regarding projected food sales at the Arlington Heights station. The study determined that the location would be a "poor food location," and, using the study's projected food sales figure of $12,500 monthly, Strasheim's projected monthly net income would be a loss of $1,250. Limbach did not present the Ancillary Enterprises study to Strasheim. Limbach and others involved in the site selection had not seen the study.

Second, at the time Limbach presented the projections to Strasheim, Amoco had in its possession "752 Forms" projecting an annual profit to the franchisee of only $20,-400 from pumpers similar, but not identical, to the pumper planned for the Arlington Heights location. Amoco also knew that, in 1983, many franchisees operating pumpers in the Chicago area suffered losses and qualified to participate in Amoco's rental assistance program. Under this program, Amoco rebated monthly rental payments in order to provide franchisees with a minimum monthly pre-tax net income of $1,000.

Third, Strasheim presented evidence at the hearing that, in November, 1983, Amoco began directly operating pumpers in the Chicago area through a new management services division. Amoco was directly operating thirty-four pumpers in the Chicago area by April, 1985. Strasheim also presented some evidence that Amoco is of the opinion that company-operated pumpers are more profitable than franchise-operated pumpers.

Fourth and finally, in December, 1984, after Strasheim had filed this suit, Amoco performed an analysis of its pumpers. The average sales and profit margin figures in this analysis, when applied to the Arlington Heights location, indicate that the station would provide little or no income if operated as a pumper.

In the summer and fall of 1984, Strasheim investigated the profitability of pumpers in the Chicago area. He discovered that many pumpers were not profitable, and was informed that a franchisee could operate at a profit only by operating more than one pumper, given the low per gallon profit margin of pumpers. About this time, Amoco offered Strasheim the opportunity to operate as a full-service station another Amoco franchise approximately one mile from Strasheim's station, provided Strasheim could buy out the current franchisee. Strasheim began negotiating with the current franchisee, but was unable to reach an agreement. Strasheim informed Amoco that he would only operate the full-service franchise if he could also operate the Arlington Heights pumper. Amoco informed Strasheim that he could operate one franchise or the other, but not both. Eventually, another Amoco franchisee which had already accepted a pumper conversion proposal for his first franchise acquired the full-service franchise. Subsequently, in November, 1984, Strasheim filed this action.

## II. Preliminary Injunctive Relief Under Section 105(b)(2) of the PMPA

■ Section 105(b)(2) of the PMPA provides in relevant part:

[T]he court shall grant a preliminary injunction if—

(A) the franchisee shows—

(i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and

(ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and

(B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

Congress relaxed the normal preliminary injunction standard in this section of the PMPA. Under Section 105(b)(2), a plaintiff need not show irreparable harm. *Greco v. Mobil Oil Corp.*, 597 F.Supp. 468, 472 (N.D.Ill.1984); *Baldauf v. Amoco Oil Co.*, 553 F.Supp. 408, 417 (W.D.Mich.1981), *aff'd*, 700 F.2d 326 (6th Cir.1983) (*per curiam*). Also, the plaintiff need not show a probability of success on the merits, but need only show some reasonable chance of success on the merits. *Greco*, 597 F.Supp. at 472; *Baldauf*, 553 F.Supp. at 417. "Thus, in order for the court to grant a preliminary injunction, there must exist a serious question which is fair ground for litigation; there must be a reasonable chance for success on the merits; and the balance of hardships must be in the franchisee's favor." *Greco*, 597 F.Supp. at 472.

■ The primary issues raised in this motion are: (1) whether Section 102(b)(3)(A) or (D) of the PMPA applies in this case; (2) whether Amoco satisfied the notice requirements in Section 104 of the PMPA; and (3) if Section 102(b)(3)(A) applies, whether Amoco satisfied the requirements of that section. The court finds, first, that Section 102(b)(3)(A) governs this case. Under Section 102(b)(3)(A), a franchisor may choose not to renew a franchise relationship where the franchisor and franchisee fail to agree to changes or additions to the provisions of the franchise, as long as the changes or additions are the result of determinations made by the franchisor in good faith and in the normal course of business, and the franchisor is not using the altered terms as a pretext to avoid renewal. Section 102(b)(3)(D), on the other hand, provides that a franchisor may choose not to renew a franchise relationship because, for example, it has decided to materially alter, add to or replace the premises. However, under Section 102(b)(3)(D), the franchisor must make a bona fide offer to sell the premises to the franchisee or must offer the franchisee a right of first refusal if a third party has offered to purchase the franchisor's interest in the premises.

Several courts have already determined that Section 102(b)(3)(A), rather than (D), governs in cases such as this where the franchisor offers to renew the lease relationship, but with an additional provision giving the franchisor the right to convert the station from a full-service station to a "pumper." *Valentine v. Mobil Oil Corp.*, 789 F.2d 1388 (9th Cir.1986); *Radecki v. Amoco Oil Co.*, 634 F.Supp. 1393 (D.Minn. 1986); *Baldauf*, 553 F.Supp. 408, *aff'd*, 700 F.2d 326. *But see Gardner v. Utah Oil Co.*, No. 84–402–RE (D.Or. Oct. 12, 1984) (Section 102(b)(3)(D) applies).* The court finds the analyses and holdings of *Valentine*, *Radecki* and *Baldauf* persuasive. The plain language of the statute and its legislative history make clear that "the PMPA allows the franchisor to alter the franchise and franchise relationship, even if the result is particularly severe or harsh to the franchisee who may have been associated with the franchisor for many years, in response to changed market and economic circumstances, provided that this alteration is the result of a decision which the franchisor made in good faith and in the normal course of business, and not for the purpose of preventing the nonrenewal of the franchise relationship." *Radecki*, 634 F.Supp. at 1400.

■ Second, the court finds that Amoco's letter to Strasheim dated May 11, 1984, *see* Exhibit "B" to Strasheim's complaint, met the notice requirements of Section 104 of the PMPA. Under Section 104, Amoco was required to furnish Strasheim with written notification of nonrenewal, including a statement of Amoco's reasons for nonrenewal, not less than ninety days prior to the effective date of the nonrenewal. In the letter, Amoco stated that it would request an added provision in the new lease giving it the right to convert the station to a "pumper," and that, should Strasheim decline the new lease, Amoco would not renew the franchise relationship effective December 1, 1984. This notice sufficiently specified Amoco's reason for possible nonrenewal, and therefore met Section 104's

---

\* Given that the District of Oregon is in the Ninth Circuit, and that Circuit recently found Section 102(b)(3)(A) applicable in *Valentine, Gardner* has little precedential value.

requirements. *Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1225–26 (7th Cir.1982); *Baldauf,* 553 F.Supp. at 417.

Third, the court finds that there exists a sufficiently serious question that Amoco's decision to renew only upon acceptance of the pumper conversion provision was not made in good faith and in the normal course of business, but was made for the purpose of avoiding renewal. Amoco has the burden of establishing that the proposed changes to the lease agreement were made in good faith, in the normal course of business, and not as a pretext for nonrenewal. *Lippo v. Mobil Oil Corp.,* 802 F.2d 975, 977 (7th Cir.1986). However, Amoco need only demonstrate that it acted with subjective good faith, not that its actions were objectively reasonable. *Lippo,* 802 F.2d at 977–78; *Brach,* 677 F.2d at 1222; *Radecki,* 634 F.Supp. at 1401–02. Furthermore, Amoco need not prove subjective good faith with direct evidence of an actual state of mind; objective evidence, such as inter-office memoranda, prior dealings between the parties, and the manner in which the changes to the franchise relationship were promulgated and presented, may constitute circumstantial proof giving rise to an inference of either good or bad faith on the part of the franchisor. *Radecki,* 634 F.Supp. at 1402.

Strasheim presented extensive objective evidence at and before the preliminary injunction hearing from which the court may infer that Amoco acted with subjective bad faith when it insisted that Strasheim agree to the pumper changes, which would require a substantial investment from Strasheim, or face nonrenewal. In its objection to the Magistrate's Report and Recommendation, Amoco refutes some of Strasheim's evidence. However, this court finds that, notwithstanding Amoco's objections, Strasheim has shown that he has a reasonable chance for success on the merits of his claim that Amoco did not satisfy the requirements of Section 102(b)(3)(A). *Cf. Radecki,* 634 F.Supp. at 1402 (court could not say that franchisor met Section 102(b)(3)(A)'s requirements as

a matter of law, and therefore denied cross-motions for summary judgment).

As for the balance of hardships, the court finds that the balance weighs heavily in favor of granting the injunction requested in this case. *Greco,* 597 F.Supp. at 473. The harm to Strasheim, the loss of his franchise, far outweighs any harm to Amoco if the franchise relationship is continued until the court reaches the merits of this case.

Accordingly, the court finds that Strasheim has met the requirements for preliminary injunctive relief in Section 105(b)(2) of the PMPA. The court orders Amoco to maintain the franchise relationship on its existing terms until a resolution of this case on the merits. The court notes that the findings in this opinion are preliminary, and the court will consider additional evidence and testimony in making its final determination in this case.